[No. D044999. Fourth Dist., Div. One. Jan. 30, 2006.]

WILLIAM M. BANDT et al., Plaintiffs and Appellants, v.
BOARD OF RETIREMENT OF THE SAN DIEGO COUNTY
EMPLOYEES RETIREMENT ASSOCIATION, Defendant and Respondent;
COUNTY OF SAN DIEGO, Intervener and Respondent.

**COUNSEL**

Law Offices of Michael A. Conger, Michael A. Conger and Richard H. Benes for Plaintiffs and Appellants.

Crowell & Moring, Steven P. Rice and Van-Dzung Nguyen for Defendant and Respondent.

John J. Sansone, County Counsel, and Diane Bardsley, Assistant County Counsel, for Intervener and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Appellants William M. Bandt and Byron E. Ellsworth are former employees of the County of San Diego (County) and are members of the San Diego County Retirement Association (Association). The Association is administered by the Board of Retirement (Board). The County is a public agency that elected to establish the Association's pension fund (pension fund or fund) pursuant to the County Employees Retirement Law (CERL). (Gov. Code, § 31500.) The Board manages the pension fund pursuant to article XVI, section 17[1] of the California Constitution and the CERL (Gov. Code, § 31450 et seq.). Under the CERL, counties make contributions to their members' pension funds to cover the normal accrual of liabilities and may make additional contributions to cover any amortized unfunded liability in the fund. (Gov. Code, § 31453.5.)

In March 2002, the County increased the pension benefits for members of the Association, including appellants, by approximately $1.1 billion. This

___

[1] All subsequent references to section 17 are to the California Constitution, article XVI, section 17.

increase in benefits caused a corresponding increase in the liabilities of the pension fund. Prior to this increase in benefits, the County decided that rather than amortizing the full amount of the $1.1 billion increase, it would voluntarily reduce the unfunded liability in the pension fund by issuing pension obligation bonds in the amount of $550 million.

In September 2002, the Board performed its annual actuarial valuation of the pension fund, as of June 30, 2002. The June 30 valuation reflected the huge increase in liabilities in the pension fund caused by the $1.1 billion in benefit enhancements. However, the valuation did not take into account the $550 million voluntary deposit the County made to the fund in October 2002 from the issuance of the pension bonds because, as a result of litigation unrelated to this case, the County was unable to deposit the proceeds from the sale of the pension bonds into the pension fund until October 3, 2002.

In May 2003, at the County's request, the Board approved an interim valuation of the pension fund as of October 3, 2002, for the purpose of reflecting the County's $550 million voluntary contribution to the pension fund. The effect of the Board's action in adopting the interim actuarial valuation was to reduce the amount of the County's employer contribution to the fund for the 2003 fiscal year from what the County would otherwise have had to contribute based on the June 30, 2002 valuation.

Appellants filed a complaint seeking declaratory relief and a petition for writ of mandate challenging the Board's decision to adopt the October 3, 2002 interim actuarial valuation of the pension fund. Appellants claimed that the Board's action violated section 17, subdivision (b), which provides in relevant part, "A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." The trial court denied appellants' petition for writ of mandate and dismissed their complaint. On appeal, appellants renew the claim they raised in the trial court.

Appellants acknowledge that the County's increase in retirement benefits was "generous," and that it undisputedly benefited the Association's members. Appellants do not dispute that the Board had the authority to perform the October 3, 2002 interim valuation and acknowledge that, if the Board had not performed the October 3, 2002 interim valuation, the County's $550 million voluntary contribution would have been reflected in its June 30, 2003 valuation. Appellants concede that the Board has the power to establish a reasonable amortization period for the system's unfunded liability, which may not exceed 30 years. Appellants also acknowledge that the County's October 2002 voluntary contribution of $550 million from the pension bonds dramatically lowered the amount of unfunded liability in the pension fund. Appellants do not contend that the October 2002 interim valuation was actuarially unsound.

Appellants further concede that if the Board had reached an agreement with the County that the County would voluntarily contribute $550 million to the pension fund only on the condition that the Board conduct an interim valuation to reflect the payment, it would have been acting in the interest of its members in doing so. Appellants' only argument is that, having received the County's $550 million voluntary payment without promising to conduct such an interim valuation, the Board was constitutionally required under section 17 to maximize the amount of money in the pension fund in the short run by refusing to conduct an interim valuation that would take into account the $550 million payment.

We conclude that there is no constitutional principle that prohibited the Board from recognizing the County's voluntary contribution to the pension fund through an interim valuation. Section 17 does not require that the Board maximize the County's employer contribution at the earliest possible moment. On the contrary, it is undisputed that the Board may, under section 17, exercise its judgment to allow the County to pay for increased retirement benefits over a period of up to 30 years. (Gov. Code, § 31453.5.) If it is within the Board's discretion to do this, then it is also within the Board's discretion to decide to reflect the receipt of the County's October 2002 extraordinary voluntary payment to the fund at the time it was made.

Before the Board decided to recognize the $550 million voluntary contribution, the Association's actuary had informed the Board that the fund was in sound financial condition. The trial court found that the Board's action would not impair the ability of the fund to pay benefits to its members. The fact that the County had just granted members a $1.1 billion increase in benefits, that it had paid for half of those increased benefits in a single year, and that it was facing the prospect of laying off employee members due to fiscal difficulties encountered in 2003, further supports the conclusion that the Board acted in the interests of its members by recognizing the County's $550 million voluntary contribution by way of the interim valuation. In fact, three labor employee organizations *supported* the Board's decision to adopt the interim valuation.

We conclude that the Board did not act against the interests of its members in adopting the interim valuation and, thus, that the Board did not act unconstitutionally. The judgment is therefore affirmed.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The pension fund receives its funding from three sources: (1) employee contributions, (2) employer contributions from the County; and (3) the return

on the Association's investments. Government Code section 31453 sets forth the Board's authority to perform actuarial valuations in order to determine what the County's yearly contribution rate to the pension fund will be. Government Code section 31453, subdivision (a), provides: "An actuarial valuation shall be made within one year after the date on which any system established under this chapter becomes effective, and thereafter at intervals not to exceed three years. The valuation shall be conducted under the supervision of an actuary and shall cover the mortality, service, and compensation experience of the members and beneficiaries, and shall evaluate the assets and liabilities of the retirement fund. Upon the basis of the investigation, valuation, and recommendation of the actuary, the board shall, at least 45 days prior to the beginning of the succeeding fiscal year, recommend to the board of supervisors the changes in the rates of interest, in the rates of contributions of members, and in county and district appropriations as are necessary. With respect to the rates of interest to be credited to members and to the county or district, the board may, in its sound discretion, recommend a rate that is higher or lower than the interest assumption rate established by the actuarial survey. No adjustment shall be included in the new rates for time prior to the effective date of the revision."

■ Pursuant to Government Code section 31453.5, the County's employer contribution is divided into two components: (1) a "normal contribution rate," and (2) an unfunded liability rate. Government Code section 31453.5 provides: "Notwithstanding Section 31587, and in accordance with Section 31453 or 31510.1, the board may determine county or district contributions on the basis of a normal contribution rate which shall be computed as a level percentage of compensation which, when applied to the future compensation of the average new member entering the system, together with the required member contributions, will be sufficient to provide for the payment of all prospective benefits of such member. The portion of liability not provided by the normal contribution rate shall be amortized over a period not to exceed 30 years."

In March 2002, enhanced County retirement benefits went into effect. These benefits increased the pension fund's liability by approximately $1.1 billion. Prior to this increase in benefits, the County had determined that it would voluntarily reduce the unfunded liability in the pension fund associated with the benefit enhancements, by issuing pension obligation bonds in the amount of $550 million. Although the County planned to issue the bonds concurrently with the March 2002 increase in benefits so that the increase in the pension fund's liability resulting from the benefit increases would be offset by the deposit of the bond proceeds, the issuance of the bonds was delayed due to litigation unrelated to this case.

In September 2002, the Association's actuary prepared a valuation of the pension fund with an effective date of June 30, 2002.[2] The County had not yet issued the pension obligation bonds as of this date. As a result, the June 30, 2002 actuarial valuation included the liability to the pension created by the $1.1 billion benefit enhancements, but did not take into account any bond proceeds the fund received from the County. Due in large part to the significant increase in liability caused by the benefit enhancements, the June 30, 2002 valuation recommended an increase in the County's employer contribution rate from 0.81 percent of its payroll for the 2002 fiscal year to 32.06 percent for the 2003 fiscal year.

On October 3, 2002, the County made a $550 million voluntary payment to the pension fund from the proceeds of its sale of pension obligation bonds. At the Board's November 7, 2002 meeting, the County's chief financial officer, William Kelly, spoke. He requested that the Board appoint an ad hoc committee to work with the County in evaluating funding options for the pension fund, in view of the significant increase in the fund's liabilities caused by the March 2002 benefit increases. The Board appointed the ad hoc committee and also adopted the 2003 employer contribution rate stated in the June 30, 2002 valuation. Near the end of the meeting, Kelly indicated that, based on the ad hoc committee's work, the County might request a reduction in its 2003 employer contribution rate.

After the November 7, 2002 meeting, the Board and the County explored various funding options for the enhanced benefits as well as the Board's treatment of the County's $550 million contribution to the pension fund. The Board weighed the pros and cons of various options over a period of approximately six months, and held several committee meetings to discuss these issues. Among the County's proposals were that the Board adopt an interim valuation as of October 3, 2002, for the purpose of accounting for the Board's receipt of the $550 million voluntary contribution. In addition, the County proposed that the Board lengthen the amortization period for the unfunded accrued actuarial liability[3] (UAAL) in the pension fund to 15 years from the current 10-year period for benefit enhancement liabilities, and the current five-year period for other items.

A Board subcommittee directed the Association's actuary to prepare a valuation with an effective date of October 3, 2002. The October 3 interim valuation recognized as an asset the County's $550 million voluntary contribution and also recognized approximately $200 million in new offsetting

---

[2] Historically, the Board had utilized June 30 as the effective date for its annual actuarial valuation.

[3] "Unfunded accrued actuarial liability" is the difference between actuarial accrued liability and the valuation assets in a fund.

liabilities that were incurred after the June 30, 2002 valuation. In addition, the interim valuation adopted a new 15-year amortization period for all UAAL in the pension fund. The Board approved the October 3 interim valuation at its May 1, 2003 meeting.

The Board's adoption of the interim valuation had the net effect of lowering the County's employer contribution rate for the 2003 fiscal year from 32.06 percent of the County's payroll to 22.51 percent. The Association's actuary explained to the Board that the interim valuation lowered the County's employer contribution by between $70 million and $80 million.[4] The actuary further explained that approximately $36 million of this change was attributable to the lengthening of the amortization period, and the bulk of the remainder of the change resulted from recognition of the $550 million voluntary payment from the pension bond proceeds.

In May 2003, appellants filed a complaint against the Board and the County seeking in relevant part: (1) a declaration that the Board's May 1, 2003 action in approving the October 3, 2002 valuation violated section 17, subdivision (b); and (2) a petition for writ of mandate directing the Board to utilize the June 30, 2002 valuation and ordering the County to make the employer contribution at the rate required by the June 30, 2002 valuation.

In September 2003, appellants voluntarily dismissed the County as a defendant, without prejudice. Shortly thereafter, the parties stipulated to the County intervening as a party in interest.

In February and March 2004, the trial court held a bench trial on appellants' complaint. The court issued its statement of decision in May, in which it concluded that the Board had not violated section 17 by adopting the October 3, 2002 interim valuation. In June, the trial court entered a judgment denying appellants' petition for a writ of mandate and dismissing the complaint.

Appellants timely appeal.

---

[4] The administrative record states that the actuary said the change in the County's employer contribution was "between $70 billion and $80 billion," but it is clear the actuary meant between $70 million and $80 million.

## III.

## DISCUSSION

A. *The Board's adoption of the October 3, 2002 interim actuarial valuation did not violate the California Constitution*

Appellants claim the Board violated section 17, subdivision (b) when it voted to adopt the October 3, 2002 interim actuarial valuation that recognized the County's $550 million voluntary contribution to the pension fund, for the purpose of determining the County's employer contribution rate for the fiscal year beginning on July 1, 2003.[5]

### 1. *Standard of review*

The parties disagree as to the applicable standard of review both in the trial court and in this court. Appellants maintain that the trial court erred by reviewing the constitutionality of the Board's action under an arbitrary and capricious standard. Appellants also contend that their constitutional claim should be "independently determined by this court based upon the trial court's determination of the material facts surrounding the Board's adoption of the interim actuarial valuation." The Board and the County imply that the trial court properly reviewed the Board's action under the arbitrary and capricious standard of review and argue that this court should apply a deferential standard of review on appeal.[6]

We need not resolve this issue because we conclude that appellants' claim fails under any standard of review.

---

[5] The parties disagree as to whether an August 2003 stipulation between the parties prohibits appellants from challenging the approximately $36 million decrease in the employer contribution due to the amortization change. We need not resolve this issue because even assuming appellants may properly challenge the full approximately $75 million decrease in the County's employer contribution for fiscal year 2003 resulting from the Board's adoption of the October 3, 2002 interim valuation, we conclude that the Board did not violate the Constitution.

[6] Specifically, the Board argues, "although this court performs an 'independent' review, such review is deferential, and the Board's decision must be affirmed unless the administrative record demonstrates that [it] is not supported by substantial evidence . . . ." The County argues: "[A]fter *independently determining that the Board acted within the legal duties and discretion conferred upon it*, this Court will not reweigh the evidence. Rather, it will determine that substantial evidence in the record supports the Board's decision, and conclude that the Board's decision was neither arbitrary, capricious, or totally lacking in evidentiary support, nor procedurally unfair."

2. *Section 17 sets forth the Board's duties in its governance of the Association's pension system*

 a. *The text of section 17*

Section 17 provides in relevant part:

"Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following:

"(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.

"(b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. *A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.*

"(c) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.

"(d) The members of the retirement board of a public pension or retirement system shall diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return, unless under the circumstances it is clearly not prudent to do so.

"(e) The retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have

the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system." (Italics added.)

###### b. *The Board's duty to its participants and beneficiaries under section 17, subdivision (b)*

██ Appellants claim the Board's adoption of the interim valuation constituted a violation of the final sentence of section 17, subdivision (b). This sentence was added, along with other amendments to section 17, by the passage of Proposition 162 in 1992. In order to evaluate appellants' claim, we first consider the nature of the duty a retirement board owes to its participants and their beneficiaries that must be prioritized in accordance with the final sentence of section 17, subdivision (b). We conclude that the text of section 17, subdivision (b) is ambiguous as to a retirement board's duty to its participants and their beneficiaries and the manner in which that duty must be prioritized. However, assuming appellants' interpretation of section 17, subdivision (b) is correct, we conclude that the Board did not violate subdivision (b), for the reasons stated in part III.A.3., *post.*

██ This case raises an issue of first impression, as no prior published opinion has interpreted the current version of section 17, subdivision (b). In *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934], the Supreme Court outlined the principles that govern our interpretation of the California Constitution: "In the case of a constitutional provision adopted by the voters, their intent governs. [Citations.] To determine intent, ' "The court turns first to the words themselves for the answer." ' [Citations.] 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' [Citation.]" "Ballot arguments are accepted sources from which to ascertain the voters' intent." (*Id.* at pp. 801–802.)

###### i. *Appellants' interpretation of section 17, subdivision (b)*

Appellants define the duty a retirement board owes to its participants and their beneficiaries pursuant to section 17, subdivision (b) in various ways throughout their opening brief. In one portion of their brief, appellants assert that "[t]he *payment* of benefits" is the most important duty a retirement board owes to its participants and beneficiaries. (Italics added.) In other places, appellants appear to expand the scope of a retirement board's duty, claiming that such a board has a paramount fiduciary "duty to provide *and protect* benefits to participants." (Italics added.) Finally, appellants assert an even

broader duty, claiming that "[a] retirement board may not take any action which helps a public employer if that action *harms the interest of members*." (Italics added.)

Appellants maintain that the final sentence of section 17, subdivision (b) should be interpreted as prioritizing the three purposes of a retirement board set forth in the first sentence of section 17, subdivision (b), namely: (1) providing benefits to participants and their beneficiaries, (2) minimizing employer contributions, and (3) defraying reasonable expenses of administering the system. Appellants argue that "[t]he unambiguous language of the [final] sentence [of section 17, subdivision (b)] makes it plain that a retirement board's fiduciary duty to provide and protect benefits to its participants and their beneficiaries is paramount and cannot be subordinated to any lesser objective of 'minimizing employer contributions.' (§ 17, [subd.] (b).)"

Appellants contend that a retirement board does not have any duty to minimize employer contributions pursuant to section 17, subdivision (b). They maintain that section 17, subdivision (b) requires that a retirement board give precedence to the board's duty to its participants and their beneficiaries over the "subordinate[] objective" of minimizing employer contributions.

In their reply brief, appellants continue their reformulation of the duty a board owes to its participants and members, claiming for the first time that section 17, subdivision (b) requires that the Board give precedence to two other duties contained in other subdivisions of section 17. Specifically, appellants claim that the Board failed to give precedence to its duty to "assure [the] prompt delivery of benefits," as specified in section 17, subdivision (a). Later, appellants claim, also for the first time, that the Board failed to give precedence to its purported "fiduciary duty to assure the sufficiency of trust assets to deliver benefits," citing section 17, subdivisions (a), (e). Neither the Board nor the County have had the opportunity to respond to this reformulation of the Board's claimed duties, and appellants fail to provide any reason for raising these contentions for the first time in reply. Accordingly, we decline to consider these arguments. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894–895, fn. 10 [93 Cal.Rptr.2d 364] [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before" ' "].)

Even if we were to consider these arguments, we would not find them compelling. The duty specified in section 17, subdivision (a) is a duty to administer the system in a manner so as to assure the delivery of benefits to members. This provision requires that the Board develop an administrative

structure to assure that benefits are delivered to members in a timely manner (e.g., assuring that claims for benefits are processed and paid properly), and not with assuring that the fund is adequately funded. The Board's decisions regarding the appropriate level of an employer's contributions to the pension fund simply do not impact its ability to carry out this duty.

The duty specified in section 17, subdivision (e) is expressly related to the Board's exclusive power to provide for actuarial services. It is not a freestanding provision requiring that the Board "assure the sufficiency of trust assets to deliver benefits," as appellants contend. Appellants expressly state that they are not claiming the interim valuation was actuarially unsound. Thus, the Board's actions in approving the actuary's interim report did not constitute a violation of the Board actuarial duty to its participants and beneficiaries set forth in subdivision (e).

Accordingly, we restrict our analysis to appellants' interpretation of section 17, subdivision (b) as set forth in their opening brief.

### ii. *Section 17, subdivision (b) is ambiguous*

The final sentence of section 17, subdivision (b) does not expressly define the duty a retirement board owes to its beneficiaries that must be given precedence. The text of section 17, subdivision (b) could reasonably be interpreted to mean that the "duty" that must be given precedence is to act "in the interest of . . . participants and their beneficiaries" (§ 17, subd. (b)), to "provid[e] benefits to . . . participants and their beneficiaries" (§ 17, subd. (b)), or some other duty defined outside subdivision (b).

The text of subdivision (b) is also ambiguous as to whether or not its final sentence is intended to refer to the three "duties" or "purposes" specified in the first sentence. Further, it is not clear that the first sentence of section 17, subdivision (b) defines three duties of a board member. The first sentence of section 17, subdivision (b) refers to "duties with respect to the system" and outlines three purposes that may be taken by a retirement board. Thus, the final sentence of section 17, subdivision (b) could be interpreted to state that a board's duty to its participants is greater than any other duty it might have, without reference to the preceding three purposes specified in the initial sentence.

On the other hand, the constitutional genealogy and history of section 17, subdivision (b) suggests that its final sentence should be interpreted to mean that the board's duty to its participants and beneficiaries, as defined in the first sentence of subdivision (b), must take precedence over the other two duties specified in the first sentence of subdivision (b).

The court in *Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1191–1192 [49 Cal.Rptr.2d 220] outlined the purposes behind the enactment of Proposition 162:

"Proposition 162 was 'an outcome of California's recent budget difficulties and the struggle to find the financial resources to meet budget shortfalls. . . . Proposition 162 was placed on the ballot by those who opposed [Assembly Bill No.] 702, which passed the Legislature and was signed by [Governor] Wilson.' [Cal. Sen. Off. of Research, Sen. Publication No. 643-S, 'Analysis of November 1992 Ballot Propositions' (Analysis) at p. 18.]

"Briefly, the proposition in question was in response to a bill which had permitted the Legislature and the Governor to use reserve funds in a retirement system (in this case, the state Public Employees' Retirement System, or PERS) 'to substitute for normal state payments required to fund the system—thereby freeing state money to help close the budget shortfall.' (Analysis at p. 18.) (Assem. Bill No. 702 also transferred PERS actuarial functions to the Governor by giving him the power to appoint the PERS actuary.)

"The substitution of reserve account funds for state payments and the transfer of actuarial oversight powers away from PERS were 'viewed by opponents as unwise and unfair, and many called it one more "raid" on the pension system.' (Analysis at p. 18.) Proposition 162 was thus intended by its proponents to insulate the administration of retirement systems from oversight and control by legislative and executive authorities, and also return control of the actuarial function to the retirement boards themselves. This 'increased level of independence would make the [retirement] systems less of a target for local and state officials looking for a way to balance a budget.' (Analysis at p. 20.)"

The fact that the purpose of Proposition 162 was to protect against legislative and executive "raid[s]" of the pension system (*Singh v. Board of Retirement, supra,* 41 Cal.App.4th at pp. 1191–1192), is consistent with an interpretation that the final sentence of section 17, subdivision (b) was intended to provide that a retirement board's duty to its participants and members was paramount, and thus must be placed above any purpose to minimize employer contributions. The placement of the paramount duty provision as the final sentence of section 17, subdivision (b) also suggests that it should be interpreted with reference to the preceding sentence.

The legislative analyst's interpretation of the last sentence of section 17, subdivision (b) contained in the ballot materials presented to the voters prior to the enactment of Proposition 162 is consistent with this interpretation:

"[P]roviding benefits is currently one of three basic, and equal, responsibilities of the pension boards. Placing benefits as the highest priority could result in higher costs to employers if board decisions increase benefits without equal consideration to the cost for those benefits." (Ballot Pamp., Gen. Elec. (Nov. 3, 1992) analysis of Prop. 162, p. 37.)

It is unclear from the text of section 17, subdivision (b), whether the Board has a secondary duty to minimize employer contributions. The text suggests the existence of such a duty by stating that a "board's duty to its participants and their beneficiaries shall take precedence over any other *duty*." (§ 17, subd. (b), italics added.) However, it could also be argued that the final sentence does not actually define *any* duties of the board and instead should be interpreted to mean that the board's duty to its participants and members is greater than any other unspecified duty the Board may have. (See *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1494 [280 Cal.Rptr. 847] (*City of Sacramento*).)

In *City of Sacramento*, the court interpreted the employer contribution minimization provision contained in section 17, subdivision (b), prior to the addition of the final sentence of that subdivision instructing the Board to give precedence to its duty to participants and their beneficiaries. The *City of Sacramento* court expressed skepticism as to whether a retirement board had a duty to minimize employer contributions, but stated "even assuming article XVI, section 17 creates a duty to minimize employer contributions," any such assumed duty was subordinate to a retirement board's paramount duty to its beneficiaries. (*City of Sacramento, supra*, 229 Cal.App.3d at p. 1493.)

*City of Sacramento* was decided during the year prior to the passage of Proposition 162, and contains language strikingly similar to that contained in Proposition 162. (Compare *City of Sacramento, supra*, 229 Cal.App.3d at p. 1494 ["Any duty PERS has to minimize employer contributions may not take precedence over its duty to the beneficiaries of the system"] with § 17, subd. (b) ["A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty"].) Accordingly, one could argue that the final sentence of subdivision (b) should be interpreted as merely constitutionalizing the *City of Sacramento* court's statement that a retirement board's duty to its participants and members takes precedence over any other possible duty the Board may have, rather than to mean that a retirement board in fact has a secondary duty to minimize employer contributions.

iii. *For purposes of this decision, we assume that appellants'*
*interpretation of section 17, subdivision (b) in their opening*
*brief is correct*

We conclude that the language of section 17 subdivision (b) is ambiguous. However, because none of the ambiguities are material for purposes of our decision in this case, we need not define the precise contours of section 17, subdivision (b) in this opinion. Rather, we assume for purposes of this decision that the broad interpretation of section 17, subdivision (b) offered by appellants in their opening brief is correct. Accordingly, in determining whether the Board violated section 17, subdivision (b) in part III.A.3., *post*, we assume, as appellants contend, that the Board has a "paramount duty" to act in "the interest of [its] members," and that this duty must be given precedence over any other duties the board may have, including any "subordinate[] objective" to minimize employer contributions.

Neither party has offered a constitutional standard by which this court should determine whether a retirement board has violated its constitutional mandate by acting in a manner contrary to the interest of its members. The law of corporate governance provides one possible standard for determining whether a board's action was in the interest of its members. (See *Kovich v. Paseo Del Mar Homeowners' Assn.* (1996) 41 Cal.App.4th 863, 869 [48 Cal.Rptr.2d 758].) [" '[N]either a court nor minority shareholders can substitute their business judgment for that of a corporation where its board of directors has acted in good faith and with a view to the best interests of the corporation and all its shareholders' "].) Doubtless, there are other standards that are less deferential to a retirement board's judgment. However, we find it unnecessary to adopt a precise constitutional standard by which to determine whether the retirement board has violated its duty to act in the interests of its members, because we conclude that under even the broadest sense of the phrase, the Board did not act unconstitutionally in this case.

3. *The Board's action in recognizing the County's voluntary*
*contribution to the pension fund did not violate section 17*

a. *The Board's action in recognizing the County's voluntary*
*contribution to the pension fund did not materially affect*
*members' benefit security*

Appellants claim the Board's decision to recognize the County's voluntary contribution to the pension fund harmed members by decreasing their benefit security, i.e., their assurance that benefit promises will be paid when they come due. Appellants maintain that it "defies common sense" to suggest that

it is better to have less, rather than more, money in their pension trust fund. Appellants contend that the Board's action had the effect of increasing the amount of UAAL in the pension trust fund and that this is, by definition, bad for members because it decreases their benefit security.

A decision that increases UAAL is not necessarily bad for members. As the actuary's June 30, 2002 valuation makes clear, the primary cause of the increase in UAAL in the Association's pension fund in 2002 was an increase in pension benefits valued at approximately $1.1 billion.[7] Obviously, such benefit increases do not harm members. If the Board were prohibited from increasing UAAL, such benefit increases may not have been granted, since the County might have determined that such increases were unaffordable. As the Association's actuary noted in his June 30, 2002 actuarial valuation in defining UAAL: "Most retirement systems have [UAAL]. They arise each time new benefits are added and each time an actuarial loss is realized. [¶] The existence of [UAAL] is not in itself bad, any more than a mortgage on a house is bad. [UAAL] does not represent a debt that is payable today."

Thus, it is not the case that any decision that increases UAAL is necessarily harmful to members.

Even assuming that an increase in the UAAL of the pension fund harmed members by decreasing their assurance that they would receive their benefits, the harm was not material. The trial court expressly found that "the Board's decision did not impair the ability of the fund to pay benefits to its members." This finding was supported by substantial evidence, as to both active and retired members.

The Board was advised by the Association's chief operating officer that adopting the interim valuation would have no impact on the fund's ability to keep its pension promise to active and retired members. With regard to retired members, the pension fund was fully funded. With regard to active members, the Association's chief operating officer reported that the "proposed 15 year timeline [to retire the UAAL] would allow for all current unfunded liabilities to be funded on average by the time needed to make payments to the current active employees." The Association's actuary stated in his October 3, 2002 valuation that the pension fund was "in sound financial condition." The Association's actuary stated in his October 3, 2002 valuation, and the trial court found, that the funded ratio of the pension fund was 82.5 percent as of that date. The fund had approximately $4.2 billion in valuation assets as of October 3, 2002.

---

[7] The June 30, 2002 valuation notes that the pension fund's "funded ratio" would have decreased from 99.2 percent without the benefit increases to 75.4 percent with the benefit increases. The funded ratio represents the fund's valuation assets divided by the amount of actuarial accrued liability.

We conclude that any harm to members in terms of a decrease in their benefit security stemming from an approximately $75 million[8] decrease in the County's employer contribution for the 2003 fiscal year in the $4.2 billion fund was not material under the circumstances of this case.

> b. *The Board's decision to recognize the County's voluntary contribution to the pension fund benefited members*

Appellants also claim the Board's decision to recognize the County's voluntary contribution to the pension fund did not benefit members.

Appellants take particular issue with the trial court's finding that the Board's decision to adopt the interim valuation "provided an incentive to the County to issue [pension] bonds in the future." As appellants themselves acknowledged in the trial court and reiterated at oral argument in this court, it is clear that the Board could have determined that it would be in its members' interest for the Board to reach an agreement with the County by which the County would make a $550 million voluntary contribution to the pension fund on the condition that the Board reflect such a payment through an interim valuation.[9] Appellants' claim is essentially that, having received the County's $550 million voluntary payment without such an agreement, the Board was required to attempt to maximize the amount of money in the fund in the short run by refusing to conduct an interim valuation. There is no constitutional principle in section 17, subdivision (b) that would require the Board to act in this manner. On the contrary, it is in the members' interest to have the County trust that the Board is going to take its secondary objective—i.e., to minimize employer contributions—seriously.

■ Appellants' argument that the Board did not have to provide an incentive to the County to issue pension bonds in the future because the Board has the statutory authority to shorten the amortization schedule for the County's payment of the unfunded liability supports the conclusion that the Board was not required to minimize the amount of UAAL in the fund by refusing to adopt the interim valuation. As appellants acknowledge, the Board has the power "to establish a reasonable amortization period for the system's unfunded liability, which may not exceed 30 years," citing Government Code section 31453.5. The Board's power to amortize the fund's UAAL over a 30-year period is consistent with section 17, subdivision (b) because it allows

---

[8] As noted in footnote 5, *ante*, we assume for purposes of the decision that the appellants are able to challenge the full $75 million decrease in the County's employer contribution.

[9] Specifically, in the trial court, appellants argued: "Now if the facts are different, Your Honor, then I completely agree that there's a different analysis. If the County comes to the Board and says we're thinking about contributing $500 million. If we do, what's in it for us? But that's not what happened."

the County to grant an increase in benefits and to pay for the increased cost of the benefits over time as the associated pension obligations become due.

If the Board may constitutionally exercise its judgment as to the period of time over which UAAL is to be amortized, we see no constitutional principle that would prohibit the Board from recognizing a voluntary contribution to the pension fund through an interim valuation. The net economic effect of either decision would be the same, i.e., the County's employer contribution would be spread over a period of time that is consistent with the Board's judgment as to the amount of funds necessary to adequately ensure the payment of pension obligations.[10]

We conclude that the Board could reasonably have determined that the Board's willingness to provide an interim valuation for the purpose of recognizing County's $550 million voluntary payment to the pension fund would encourage the County to make additional future voluntary contributions to the pension fund.

Another benefit to members stemming from the Board's adoption of the interim valuation was the staving off of possible job losses by active members. The Board was informed prior to its decision to recognize the County's voluntary contribution that the County might have to lay off up to 1,500 active members if the Board refused to adopt the interim valuation. For this reason, three labor employee organizations *supported* the Board's decision to adopt the interim valuation. This fact supports the conclusion that the Board's adoption of the interim valuation was in its members' interests.

We reject appellants' argument in their reply brief that the Board was prohibited from considering its active members' interest in retaining their jobs. The primary argument appellants advance in support of this claim is that the Board could properly consider only members' interests as beneficiaries, and not their interests as employees, in determining whether or not to adopt the interim valuation. Even assuming appellants are correct in asserting that the Board's sole duty is to protect members' interests as beneficiaries, the pension of a member who loses his job will be dramatically affected by that job loss. Thus, a member's interest as an employee is clearly related to his interest as a pension beneficiary. Further, the Board was informed by the Association's actuary that job losses could also negatively impact the financial condition of the retirement fund itself. We therefore reject appellants' argument that the Board was prohibited from considering potential job losses in making its decision to adopt the interim valuation.

---

[10] In this case, as noted in part II, *ante*, in adopting the interim valuation, the Board also increased the amortization period for the County's payment of the UAAL.

c. *Appellants' remaining arguments for invalidating the Board's action are unpersuasive*

Appellants claim the Board's action in adopting the interim valuation demonstrates "a *pattern* of trust fund mismanagement *favoring the public employer* over many years [that] create[d] such massive unfunded liability." The facts do not support this assertion.

The actuary's valuation for June 30, 2002 indicated that the pension fund was more than fully funded throughout the late 1990's. The valuation further stated that the funded ratio decreased from 106.8 percent as of June 30, 2001 to 75.4 percent as of June 30, 2002, but that the funded ratio would have been 99.2 percent on June 30, 2002, without the March 2002 retirement benefit increases. In short, the fund was more than fully funded until the County dramatically increased retirement benefits for members in 2002. Thus, it was an action that clearly benefited members—an increase in retirement benefits—rather than trust fund mismanagement favoring the County, that caused the increase in the fund's UAAL.

▮ Finally, appellants claim that the Board's action conflicted with the principle of intergenerational equity, i.e., "calculating and receiving during each fiscal year contributions which, expressed as percents of active member payroll, will remain approximately *level* from the present generations of citizens to future generations of citizens." However, there is nothing in section 17, subdivision (b) that would require that the Board act in a manner consistent with the principle of intergenerational equity. Therefore, even assuming the Board's action conflicted with this principle, we reject the argument that this would violate the Constitution. Further, as noted above, the primary cause of the dramatic increase in the UAAL in the fund and the County's employer contribution in recent years was an increase in member benefits granted by the County. Thus, any deviation from a level contribution system by the Board bemoaned by appellants is directly related to the increased retirement benefits, which is undisputedly in the interest of members.[11]

4. *Any error in excluding evidence from outside the administrative record was harmless*

Appellants claim the trial court erred in excluding evidence from outside the administrative record in this case. Assuming, without deciding, that the trial court erred in excluding the evidence, any such error was harmless.

---

[11] The Association's actuary stated in his October 3, 2002 interim valuation that the fund was "in sound financial condition in accordance with the actuarial principles of *level-cost* financing." (Italics added.)

The Board and the County filed a joint pretrial motion in limine to exclude all evidence not contained in the administrative record of the Board's action. The Board and the County argued that evidence from outside the administrative record was inadmissible because appellants were challenging a quasi-legislative administrative action. Appellants opposed the motion, claiming that the extra-record evidence was admissible because, among other reasons, it was being offered to challenge the constitutionality of the Board's action. Appellants argued, "[A] challenge to an administrative decision on constitutional grounds is not limited only to a review of the administrative record." The trial court granted the in limine motion, ruling that "because the Board's actions were quasi-legislative, extra-record evidence is not admissible."

Appellants presented the trial court with an offer of proof of evidence they intended to present in support of their claim that the Board violated section 17, subdivision (b). The evidence consisted primarily of the deposition transcripts of various Board members, the chief operating officer of the Association, and the County's chief financial executive.[12] The excluded evidence can be grouped into four main categories: (1) testimony intended to show ignorance among Board members pertaining to various financial characteristics of the fund; (2) testimony offered to demonstrate that the Board did not consider the risk that the County would fail to repay the amount of money by which its employer contribution was lowered for 2003; (3) testimony from Board members pertaining to communications between Board members and local politicians regarding the disputed action; (4) evidence offered to show that the Board's decision to adopt the interim valuation was made in secret.[13]

We need not decide whether or not this evidence was admissible because any error in excluding the evidence was harmless. The inability of individual Board members to recall characteristics of the fund does not establish that the Board acted against the members' interests. In view of our conclusion that the decrease to members' benefit security was immaterial, the Board's failure to

---

[12] The Board also claimed that much of the extra-record evidence was inadmissible on the ground that it pertained to the thought processes of individual Board members in reaching their decision to adopt the interim valuation. However, the trial court did not exclude the evidence on this ground because it ruled that the extra-record evidence was inadmissible as being outside the administrative record. For the reasons stated in the text, even assuming all of appellants' extra-record evidence was admissible, the trial court's exclusion of the evidence from the trial was harmless.

[13] Appellants also offered the deposition transcript of Douglas Rose, a current Board member, who was formerly a litigant against the Board. Rose's testimony pertained to prior actions taken by the Board, and was irrelevant to appellants' claims in this case. In addition, appellants offered a statement Kelly made during his deposition in which he discussed the Board's financial treatment of the County's $550 million voluntary contribution. Kelly essentially stated that the County's contribution could be used to offset its employer contribution in some fashion, and did not tend to prove appellants' claim that the Board's action was against its members' interest.

consider the County's risk of default was not harmful to members' interests. Finally, evidence of communications between Board members and local officials and evidence of discussions regarding the proposed action to be taken by the Board prior to the meeting at which the action was formally adopted, does not establish that the action harmed members' interests.[14]

In sum, none of the excluded evidence, whether considered individually or cumulatively, demonstrates that the Board acted unconstitutionally in adopting the interim valuation. Accordingly, we conclude that any error in excluding the extra-record evidence was harmless.

B. *The trial court prepared an adequate statement of decision*

Appellants claim the trial court prepared an inadequate statement of decision, under Code of Civil Procedure section 632.

■ In *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67–68 [76 Cal.Rptr.2d 356], the court outlined a trial court's duty to prepare an adequate statement of decision: " 'A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. A trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence. Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result. Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. A failure to find on an immaterial issue is not error. [Citation.] In issuing a statement of decision, the trial court need not address each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request. [Citation.]' [Citations.]"

Appellants claim the trial court erred by failing to rule on whether:

(1) benefit promises are at risk whenever the pension fund is less than fully funded;

(2) the pension fund was underfunded in particular dollar amounts as of October 3, 2002;

(3) the Board gave fair notice of its May 1, 2003 board meeting;

---

[14] Appellants have not made any independent claim that these actions were improper.

(4) the Board's decision was harmful to members because it decreased their benefit security;

(5) the Board's action was harmful to members because it violated the Board's policy of diversification of assets;

(6) the Board's management of the trust fund showed a historical pattern of favoring the County at the expense of participants and members;

(7) the Board owes a constitutional duty to the County to minimize employer contributions;

(8) the Board's argument that its decision to recognize the County's voluntary contribution by way of an interim valuation was pretextual;

(9) the Board gave precedence to its duty to its participants and their beneficiaries over minimizing employer contributions.

The trial court prepared a detailed eight-page statement of decision in which it set forth both the factual and legal basis for its decision. The court expressly found that the Board's decision did not violate section 17, and also that the "Board's decision did not harm the interests of the system's participants and their beneficiaries." The court provided a description of the factual circumstances surrounding the Board's adoption of the interim valuation and provided findings on the appellants' and the Board's competing contentions regarding whether that action harmed or benefited members.

Most of the alleged shortcomings of the trial court's decision are in the nature of legal conclusions rather than factual findings. However, "[a] statement of decision is required to resolve all material issues of fact, not law." (*Pallco Enterprises, Inc. v. Beam* (2005) 132 Cal.App.4th. 1482, 1501 [34 Cal.Rptr.3d 490].) We conclude that none of the purported shortcomings in the statement of decision constitutes a failure to provide "an explanation of the factual and legal basis for the court's decision." (*Kazensky v. City of Merced, supra*, 65 Cal.App.4th at p. 68.) Further, because we have reviewed appellants' legal contentions de novo, any failure on the part of the trial court to fully set forth the basis of its legal conclusions would be harmless.

The trial court addressed most of the issues appellants raise. Issues 1, 4, and 5 all relate to whether benefits were placed at risk by the Board's decision. The court found, "[t]he Board's decision did not impair the ability of the fund to pay benefits to its members." Issue 2 was addressed by the court in the context of rendering a finding on the pension fund's funded ratio

as of October 3, 2002. Issue 3 is irrelevant in view of our assumption that the trial court erred in restricting appellants to the administrative record. Although the trial court did not specifically address issue 6, that issue was not material to explaining the basis for the court's decision.

Finally, the court expressly addressed issues 7, 8 and 9 in its statement of decision. The trial court stated that the Board "fulfilled its duty to minimize employer contributions" (issue 7), found that the Board's action provided an incentive to the County to issue bonds in the future (issue 8), and found that the Board's action did not harm the interest of participants and their beneficiaries (issue 9).

We conclude that the trial court prepared an adequate statement of decision.

IV.

DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

McConnell, P. J., and Haller, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 10, 2006, S141657. George, C. J., did not participate therein.