BILL LOCKYER Attorney General GREGORY L. GONOT Deputy Attorney General
THE HONORABLE KEITH RICHMAN, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
May the Board of Administration of the California Public Employees' Retirement System extend the payment schedule for retroactive benefits beyond the average remaining work period of the employees eligible to receive the benefits without violating the board's constitutional duties to provide secure benefits to its members, minimize costs to employers, assure the competency of the assets of the retirement system, and protect the employees' contractual rights to an actuarially sound retirement system?
 CONCLUSION
The Board of Administration of the California Public Employees Retirement System may extend the payment schedule for retroactive benefits beyond the average remaining work period of the employees eligible to receive the benefits without violating the board's constitutional duties to provide secure benefits to its members, minimize costs to employers, assure the competency of the assets of the retirement system, and protect the employees' contractual rights to an actuarially sound retirement system.
 ANALYSIS
The Legislature has enacted a comprehensive statutory scheme, the Public Employees' Retirement Law (Gov. Code, §§ 20000-21703; "PERL"),[1] establishing the Public Employees' Retirement System (§ 20058; "CalPERS") under the management and control of a Board of Administration (§ 20120; "Board"), to provide retirement benefits for public employees. (See City of Huntington Beach v. Board ofAdministration (1992) 4 Cal.4th 462, 466; California Association ofProfessional Scientists v. Schwarzenegger (2006) 137 Cal.App.4th 371,376; City of Oakland v. Public Employees' Retirement System (2002)95 Cal.App.4th 29, 33; Pomona Officers' Assn. v. City of Pomona (1997)58 Cal.App.4th 578, 584-585; Board of Administration v. Wilson (1997)52 Cal.App.4th 1109, 1119-1120; Oden v. Board of Administration (1994)23 Cal.App.4th 194, 198; Claypool v. Wilson (1992) 4 Cal.App.4th 646,653-655; City of Sacramento v. Public Employees Retirement System (1991)229 Cal.App.3d 1470, 1478-1479; Valdes v. Cory (1983)139 Cal.App.3d 773, 780-783; 86 Ops.Cal.Atty.Gen. 95, 95-96 (2003).)[2] While CalPERS is part of the State and Consumer Services Agency (§ 20002), the benefits are provided not only for state employees but also for the employees of local public agencies that have contracted with the Board for coverage. (Quintana v. Board of Administration (1976)54 Cal.App.3d 1018, 1021; 71 Ops.Cal.Atty.Gen. 129, 129-130 (1988);70 Ops.Cal.Atty.Gen 189, 190-191 (1982)). The Board is composed of 13 members (§ 20090; 72 Ops.Cal.Atty.Gen. 58, 59 (1989)), serving four-year terms of office (§ 20095).
The Board is subject to the requirements of article XVI, section 17, of the Constitution (see Westly v. California Public Employees'Retirement System (2003) 105 Cal.App.4th 1095, 1099-1102;86 Ops.Cal.Atty.Gen. 86, 87-88 (2003); hereafter "article XVI"), which states in relevant part:
 "Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following:
 "(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.
 "(b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.
 "(c) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.
 "(d) The members of the retirement board of a public pension or retirement system shall diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return, unless under the circumstances it is clearly not prudent to do so.
 "(e) The retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system.
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(h) As used in this section, the term 'retirement board' shall mean the board of administration, board of trustees, board of directors, or other governing body or board of a public employees' pension or retirement system. . . ."
We are asked to determine whether the Board may extend the payment schedule for retroactive benefits beyond the average remaining work period of the employees eligible to receive the benefits without violating the Board's constitutional duties under Article XVI. For example, in 1999, the Legislature authorized enhanced retirement benefits for CalPERS members under new service retirement formulas. (Stats. 1999, ch. 555.) The Board funded these retroactive benefits out of existing surpluses, thereby amortizing the liability immediately. We are asked whether the Board could have instead extended the payment schedule beyond the average remaining work period of the employees eligible to receive the benefits. We conclude that it could have done so.
In analyzing the question presented, we first must consider the definitions of the relevant terms used therein. With respect to the phrase "extend the payment schedule," we note that a pension plan develops "surplus" or is "ahead of schedule" when plan assets exceed a scheduled desirable level known as the "accrued liability." The plan has an "unfunded liability" or is "behind schedule" when plan assets fall below the scheduled desirable level of assets. Plans develop surplus or unfunded liability when the actual experience of the plan (such as investment return, salary growth, terminations, disabilities, deaths, and retirements) differ from the experience anticipated by actuarial assumptions. Plans can also develop an unfunded liability or surplus because of changes in anticipated future benefits payable under the plan, such as a legislative change in plan benefits. Pension plans are almost always "off schedule" because the assumptions are long term averages, not year by year predictors; consequently, the employer's contribution must be raised or lowered to get assets back to the scheduled desirable level. The period of time that contributions are to be raised or lowered to get the plan back on schedule is called the amortization period. This time period is a matter of policy and can be lengthened or shortened. To "extend the payment schedule" is to lengthen the period for which increased or decreased contributions will be needed to get the plan back on schedule.
With regard to the phrase "retroactive benefits," we are informed that pension benefits provided by CalPERS are based upon a formula involving a benefit factor established by the Legislature as a function of three variables: the member's retirement age, the member's total years of service at retirement, and the member's final compensation rate. While not an actuarial or legal term, "retroactive benefits" is used here to refer to benefit increases that are authorized by the Legislature to be applied not only to employees' service rendered after the effective date of the authorizing legislation, but also to the years of past service that employees have already rendered prior to the effective date of the legislation — hence applying "retroactively."
Finally, we note that the phrase "beyond the average remaining work period of the employees eligible to receive the benefits" refers to the time needed, using raised or lowered employer contributions as appropriate, for a plan's assets to be returned to the scheduled desirable level, as described in the payment schedule definition above. Most public plans choose a fixed period of time to raise or lower employer contributions to "get back on schedule." We are informed that CalPERS uses a time period of 20 years to accomplish this purpose for benefit improvements. This is also the most common length of time for all public plans to use. The average period of time, statistically, that all current active workers will remain in employment before terminating, becoming disabled, dying, or retiring, is the "average remaining work period of the employees eligible to receive benefits." This number will vary depending upon such factors as the current age and composition of the workforce, the nature of the work, and the terms and benefits of the relevant retirement plan.
With these definitions of the relevant terms in mind, we first observe that the practical aspects of funding a public pension system, such as CalPERS, were recently discussed in 88 Ops.Cal.Atty.Gen. 165 (2005). We stated:
 "Once established, a public pension system operates essentially as a trust, to which current employee members and the pension plan sponsor (here, the city) make annual contributions. Contributions are made in amounts actuarially calculated to maintain the trust fund at a level sufficient to pay the benefits that have been promised to past and present employee members. . .
 "In practice, the actuarial valuation of a fund is an ongoing endeavor, requiring complex assumptions about a number of variables, as well as regular corrections based on actual experience. [Citation.] One reason why actual experience may not match actuarial assumptions is a change in the level of employee benefits. For example, a city may grant improved benefits retroactively to its existing employees as an element of enhanced compensation. A retroactive improvement in retirement benefits not only requires an increase in the city's future retirement contributions, but also creates a 'past service liability,' or debt to the retirement fund, which must be paid.
 "Another reason why actual experience may not match actuarial assumptions is that assumptions are imperfect. This may occur for any number of reasons including fluctuations in market performance, unexpected rates of employee turnover, and unforeseen increases in salary or in purchases of service credits. When the retirement fund experiences such 'net accumulated actuarial gains and losses,' contributions must be adjusted to compensate for the difference.
 "A common approach to such deviations is to amortize changes in contribution rates over a number of years. [Citation.] The number of years may vary; the longer the amortization period, the more slowly money will flow into the retirement fund from which to pay benefits or earn income. The length of an amortization period may therefore have a significant effect upon the actuarial soundness of a retirement system. [Citation.]" (Id. at pp. 167-168.)
In light of these considerations, would the method of funding the pension liabilities, as described in the present inquiry, constitute a violation of the Board's duties under article XVI?
The Board has the authority to determine what funding is required to assure the actuarial soundness of the retirement system. (Art. XVI, § 17, subd. (e).) "The preservation of the actuarial soundness of PERS entails a comparison of the funds available to meet its financial obligations with the obligations." (Claypool v. Wilson, supra,4 Cal.App.4th at p. 671.) Actuarial soundness is essentially a question of fact. (See Board of Administration v. Wilson, supra,52 Cal.App.4th at pp. 1129-1130, 1138-1139; see also Claypool v. Wilson, supra,4 Cal.App.4th at p. 672, fn. 7.)[3]
In choosing a 20-year period to fund new liabilities, the Board would be exercising its discretion as permitted under PERL. Section 20812 states:
 "Notwithstanding any other provision of this part, the board may adopt a funding period of 30 years to amortize unfunded accrued actuarial obligations for current and prior service for the purpose of determining employer contribution rates for contracting agencies and school employers. The board shall approve new amortization periods based upon requests from contracting agencies or school employers that can demonstrate a financial necessity. The board may deny a request when the request would subject the fund to an unsound financial risk . . . ."
For state "miscellaneous" members and state peace officer and firefighter members, the statutorily permitted amortization period is even longer — 40 years. (§ 20813.)
A 20-year funding period for retroactive benefits would thus come within the authorization of section 20812, regardless of whether 20 years would be beyond the average remaining work period of the employees eligible to receive the benefits. Significantly, the practice of amortizing prior service costs of benefit improvements over periods longer than the average remaining work period of the employees eligible to receive the benefits is a common practice among United States public plans. A recent study by the National Association of State Retirement Administrators reported that over 85 percent of 89 large state and local plans surveyed amortize their unfunded liability over a period of 20 years or more.
Article XVI, section 17, subdivision (b), has been construed as "express[ing] the adamant view [of the People] that the PERS Board, in matters falling within its purview, was to have a relatively unfettered hand to employ its institutional expertise, primarily on behalf ofmembers." (City of Oakland v. Public Employees' Retirement System,supra, 95 Cal.App.4th at p. 45.) "As long as an actuarial method is 'reasonable' and not 'arbitrary' or 'irrational,' it may be applied even though other approaches may be equally correct or even 'more precise' or 'better.' " (88 Ops.Cal.Atty.Gen. 1, 7 (2005); see Claypool v.Wilson, supra, 4 Cal.App.4th at pp. 680-681.)
In Bandt v. Board of Retirement (2006) 136 Cal.App.4th 140, the court recently examined the actions of a county board of retirement in providing benefits for retired county employees. The court concluded that article XVI did not prevent the county from amortizing the unfunded accrued actuarial liability in the pension trust fund over a 30-year period, thereby allowing "the County to grant an increase in benefits and to pay for the increased cost of benefits over time as the associated pension obligations become due." (Id. at pp. 158-159.) The court dismissed "appellant's claim that the [county's] action conflicted with the principle of intergenerational equity, i.e., 'calculating and receiving during each fiscal year contributions which, expressed as percents of active member payroll, will remain approximatelylevel from the present generations of citizens to future generations of citizens.'" (Id. at p. 160.) The court ruled that nothing in article XVI "would require that the Board act in a manner consistent with the principle of intergenerational equity." (Ibid.)
Like the Bandt court, we find nothing in article XVI that would require the Board to ensure that a future generation will not be paying for an increase in retirement benefits received by persons whose average remaining period in the workforce is shorter than the scheduled period for funding the benefits. The Board's constitutional responsibility is to ensure that the necessary actuarial evaluation is performed by a well-qualified actuary. A decision by the Board to fund retroactive benefits using a 20-year amortization period, in accordance with generally accepted actuarial principles, would be consistent with its obligations under article XVI even though such period might be longer than the average remaining work period of the employees eligible to receive the benefits.
We conclude that the Board of CalPERS may extend the payment schedule for retroactive benefits beyond the average remaining work period of the employees eligible to receive the benefits without violating the Board's constitutional duties to provide secure benefits to its members, minimize costs to employers, assure the competency of the assets of the retirement system, and protect the employees' contractual rights to an actuarially sound retirement system.
 *****
[1] All further references to the Government Code are by section number only.
[2] "'A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment.' [Citation.] 'The contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute.' [Citations.]" (City of Oakland v. Public Employees' Retirement System, supra,95 Cal.App.4th at p. 38.) Such a pension right may not be destroyed, once vested, without impairing the contractual obligation of the employing public entity. (Betts v. Board of Administration (1978) 21 Cal.3d 859,863.)
Funds for payment of retirement benefits under CalPERS come from assets held in trust by the Board. These assets include contributions from employees and employers, plus income earned on the investment of these contributions. The employer contribution rate is determined annually by the Board's actuary. (§ 20814; see City of Sacramento v.Public Employees Retirement System, supra,229 Cal.App.3d at pp. 1478-1479).)
[3] The Board exercises its "power to provide for actuarial services in order to assure the competency of the assets of the . . . retirement system" (Cal. Const., art. XVI, § 17, subd. (e)) by appointing a chief actuary and other staff members (§ 20098, subd. (a)) to perform these necessary services. *Page 1