Filed 2/23/17

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL R. O'NEAL et al., | F070605 |
| Plaintiffs and Appellants, | (Super. Ct. No. 648469) |
| v. | |
| STANISLAUS COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, | **OPINION** |
| Defendant and Respondent, | |
| COUNTY OF STANISLAUS, | |
| Intervenor and Respondent. | |

APPEAL from a judgment of the Superior Court of Stanislaus County. Leslie C. Nichols, Judge. (Retired Judge of the Santa Clara Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Law Office of Michael A. Conger and Michael A. Conger; Richard H. Benes for Plaintiffs and Appellants.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Defendant and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections V. and VI. of the Discussion.

Hanson Bridgett, Raymond F. Lynch, Adam W. Hofmann, and Jay Rapaport for Intervenor and Respondent.

-ooOoo-

## OVERVIEW

Appellants, Michael R. O'Neal, Rhonda Biesemeier, and Dennis J. Nasrawi, appeal from the trial court's grant of summary judgment against them, as well as several related evidentiary rulings. Appellants are members of the retirement system operated by respondent Stanislaus County Employees' Retirement Association (StanCERA) through their retirement board (the board). The intervener in this case, County of Stanislaus (County), is one of several employers required to fund the StanCERA retirement system.

In the aftermath of the recent recession, StanCERA implemented several changes to the actuarial calculations used to determine how to amortize unfunded liabilities within the system and chose to utilize so-called non-valuation funds, money not used to ensure the overall system was actuarially sound, to reduce or replace required employer contributions. Appellants filed suit, arguing these actions constituted a breach of the constitutional fiduciary duties placed on the board of a county retirement system. Specifically, appellants alleged the adoption of an amortization rate for unfunded liabilities which included a period of negative amortization violated state law and constitutional mandates. Appellants further argued the use of non-valuation funds to reduce or replace required employer contributions did the same.

Upon cross-motions for summary judgment, the trial court concluded that none of the actions taken by the board were contrary to law and, finding no material issue of fact, determined summary judgment was properly granted to StanCERA and County. Appellants have appealed this ruling and the related denial of their cross-motion for summary judgment. Related to the summary judgment appeal, appellants raise several complaints with evidentiary rulings made by the trial court which led to the exclusion of

2.

appellants' expert declarations and the introduction of evidence appellants contend should not have been considered on summary judgment.

For the following reasons we conclude the trial court correctly determined appellants were not entitled to summary judgment, but erred in determining no material issues of fact remained. We therefore reverse the grant of summary judgment to respondents and remand for proceedings consistent with this opinion. With respect to the evidentiary issues raised, we generally affirm the trial court, save for one issue, which has not been contested on appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

This case reaches us for the second time. Previously, we considered whether the trial court properly granted StanCERA's demurrer. The case now returns following the grant of summary judgment to StanCERA and County. We provide a brief overview of the claims involved to frame our discussion of relevant facts and our legal analysis.

Although detailed more fully below, the claims in this case all consider whether StanCERA violated constitutional fiduciary duties when making decisions regarding the management of the retirement system. The claims break down into two general types. The first involves StanCERA's management of certain excess-funds accounts. These accounts contained funds which are not considered when making actuarial calculations concerning the health of the retirement system. Normally, contributions and investment returns are included in the general retirement fund. However, over time, this fund can become overfunded if returns exceed expectations. These excess funds may then be separated from the general fund into special reserve funds to provide discretionary non-vested benefits to members. The first type of claim in this case questions whether money can be transferred from these funds and for what purposes such money may be used. The second type of claim involves how StanCERA accounts and corrects for investment losses and other failures to keep the overall system properly funded from an actuarial standpoint. When an actuarial accounting finds fund liabilities exceed fund assets, the

3.

difference is identified as an unfunded liability. To amortize any unfunded liability, StanCERA is obligated to increase employer contributions. It does so by adopting an amortization schedule designed to fund the unfunded liabilities within a specific period of time. The question is whether that amortization schedule can include periods of negative amortization.

StanCERA filed the initial motion for summary judgment in this case, attaching most of the evidence that was before the trial court. In explaining the history of how StanCERA managed excess funds and its unfunded liabilities, up through and including the currently contested transactions, StanCERA submitted the declaration of Kathleen Herman, Operations Manager for StanCERA since September 10, 2011, and supporting documents. Excepting certain facts concerning advice given to the board and the import of adopting a negative amortization rate, appellants generally conceded the facts identified by StanCERA were undisputed. Appellants, however, contested their relevance, legal meaning, or unstated implications.

I.       USE AND MANAGEMENT OF EXCESS FUNDS PRE-2007.

Up through 2007, StanCERA appears to have had reasonably good returns on their investments. There were instances of returns exceeding expectations. As a result, a multitude of special reserve funds were created. These included reserves to pay a $5,000 death benefit, a Legal Contingency Reserve, a Tier 3 Disability Reserve, a Contingency Reserve, a reserve to make additional payments under Government Code[1] section 31691 et seq. (the Health Insurance Reserve), and a reserve to pay supplemental cost of living increases authorized by section 31874.3 (the Special COL Reserve). These reserves totaled more than $169 million, with nearly $158 million in the Health Insurance Reserve and nearly $3 million in the Special COL Reserve. These fund reserves were generally used, as intended, to make additional health insurance payments and annually determined

---

[1]       Further statutory citations are to the Government Code unless otherwise specified.

cost of living adjustments. In 2007, the general retirement fund showed an overall net increase of nearly $188 million.

## II. EVENTS FROM 2008 THROUGH THE COMPLAINT.

In 2008, StanCERA began to experience investment losses from the global downturn. Compounding these losses, StanCERA learned that its prior actuary had made mistakes that had overinflated the actuarial calculations for the retirement fund. In 2008, the fund showed an overall net decrease of approximately $150 million. This caused the amount of unfunded liabilities to increase from around $41 million to around $232 million and the overall funding ratio to drop from 96.6 percent to 85 percent. As a result of these changes, County was faced with an actuarial accounting suggesting it increase its contributions from approximately $20 million (in 2006) to approximately $45 million (in 2008) to properly cover its employer obligations.

By the time StanCERA was working to set County's contribution levels for the 2009-2010 fiscal year, the actuarially recommended contribution had risen to over $59 million; an increase of $22.7 million over the required contribution for the 2008-2009 fiscal year. At the same time, County was suffering from a substantial decrease in revenue. County informed StanCERA that it had experienced a $17 million decrease in its discretionary revenue and had been forced over the previous two years to issue layoffs, implement hiring freezes, and reduce services to balance its budget. County asked StanCERA to consider alternative ways to alleviate the burden substantially increasing its contributions would have on StanCERA members currently working for County and County itself.

StanCERA ultimately decided to modify certain accounting procedures and transfer various funds in order to work with County on its concerns. Thus, at the board's April 28, 2009, meeting, the board voted to make three changes affecting the 2009-2010 contribution levels.

5.

First, the board voted to change StanCERA's amortization schedule for unfunded liabilities to a 30-year level percent of pay amortization rather than the 20-year level dollar amortization initially proposed. This effected two changes in the amortization schedule. Most obviously, it extended the amount of time to amortize the unfunded liability from 20 years to 30 years, thus lowering the payments required each year. It also changed how to calculate the payments owed each year. Under a level dollar amortization schedule, the same amount is paid each year such that the amount owed steadily decreases until eliminated. Under a level percent of pay schedule, the amount owed each year is tied to the size of County's payroll and the schedule takes into account expected payroll growth over time. Under such a schedule, payments will increase over time and payments early in the schedule may be insufficient to pay down the principal. Indeed, under a level percent of pay schedule, if the amortization period is 17 years or longer, at least the first year's payment will be less than the interest on the unfunded amount. If the amortization period is reset regularly, as it was set to do for a three-year period under the amendments, this could result in a schedule which could never repay the existing debt. By utilizing both a 30-year period and a level percent of pay schedule, StanCERA adopted a schedule ensuring that after 10 years the funding ratio for the overall plan would be 10 percent lower than it would have been under the level dollar schedule.

Second, the board transferred $50 million from the non-valuation Health Insurance Reserve to valuation reserves. These funds were directly credited to the valuation assets of the overall fund. The increase in valuation assets reduced the overall unfunded liability such that, under the actuarial method adopted to amortize unfunded liabilities, County's payments were reduced by approximately $2.9 million.

Third, the board transferred an additional $10 million from the non-valuation Health Insurance Reserve to reduce the payments owed by County under the amortization

6.

schedule for unfunded liabilities. This transfer was a dollar for dollar reduction in the payments owed by County.

The board again faced employer budget concerns when it calculated employer contributions for both the 2010-2011 and 2011-2012 fiscal years. With respect to the 2010-2011 fiscal year, StanCERA received a letter from County noting a projected $15.5 million increase in its obligations, explaining that, despite its efforts, County's budget projected a $20 million shortfall, and asking for additional relief with respect to County's employer contribution payments. StanCERA also received a letter from the City of Ceres noting its revenues had decreased by 20 percent but the proposed employer contributions were projected to increase from 9.58 percent of payroll to 23.21 percent of payroll, and requesting relief. In response, the board voted to transfer $21.4 million (apparently divided as $20 million from the Health Insurance Reserve and $1.4 million from the Special COL Reserve to reduce the employer payments owed under the amortization schedule for unfunded liabilities. This action was the same type of dollar for dollar reduction in payments authorized previously. At the same time, the board changed the amortization period for the unfunded liabilities to 25 years, although that still resulted in a payment which did not cover the interest accruing on the unfunded liability debt.

With respect to the 2011-2012 fiscal year, StanCERA received another letter from County. Noting it was facing another $28 million budget shortfall, County requested StanCERA authorize the use of $12.6 million remaining in the non-vested benefit reserve funds to again reduce County's retirement costs. StanCERA also received a letter from the Stanislaus County Superior Court requesting the board's consideration in offsetting significant proposed increases to the employer contributions and noting that "[w]ithout a onetime offset, the impact on the Court will be financially devastating." The board again elected to make a transfer of non-valuation reserve funds, this time in the amount of $14.3 million, to directly offset the employer payments owed to amortize unfunded

7.

liabilities. At the same time, the board again adopted a 25-year level percent of pay amortization schedule, resetting the amortization calculations.

Since 2012, the board has further reduced the amortization period for its unfunded liabilities, adopting a 24-year period in 2012 and a 23-year period in 2013, but continues to use a level percentage of pay system.

III.    THE INITIAL OPERATIVE COMPLAINT.

Appellants filed a lawsuit over the board's decisions. As the case reached us previously, appellants alleged four causes of action for various breaches of fiduciary duty. Three of these breaches allegedly occurred when StanCERA transferred funds from the non-valuation reserves to either the valuation reserves or to cover employer contribution obligations for unfunded liabilities. The accused transfers were the $10 million (claim 1) and $50 million (claim 2) transfers in 2009, and the $21.4 million (claim 4) transfer in 2010. For each of these claims, appellants asserted the transfer breached both common law and constitutional fiduciary duties, resulting in lost assets, lost investment earnings, and reduced funding ratios. The fourth breach (claim 3) allegedly occurred when StanCERA adopted the 30-year level percentage of pay amortization schedule. Appellants alleged this decision violated both statutory and constitutional fiduciary duties as well as section 31453.5, resulting in the loss of trust assets and investment earnings, and reducing the plan's funding ratio.

IV.    *O'NEAL I.*

Appellants' complaint was initially dismissed on demurrer. (*O'Neal v. Stanislaus County Employees' Retirement Association* (Apr. 4, 2012, F061439) [nonpub opn.] (*O'Neal I*).) On appeal, we reversed. In our discussion, we made three observations relevant to this appeal. First, with respect to all four claims raised, we concluded the violation of a fiduciary duty resulting in harm to a trust's corpus was a sufficient injury to support a cause of action. In reaching this conclusion, we noted appellants had alleged, but still needed to prove, the breach of certain fiduciary duties. Second, with respect to

8.

appellants' three claims relating to the loss of supplemental benefits due to allegedly improper transfers of funds, we observed the breach of fiduciary duty claim raised in that context would turn on whether StanCERA's discretionary decisions were consistent with the board's constitutional duty to act at all times for the benefit of StanCERA's members and not on the fact the benefits were not contractually required. The unproven allegation that StanCERA breached that fiduciary duty was sufficient to support a cause of action. Third, we recognized the continuing nature of StanCERA's allegedly improper conduct and need for corrective action was sufficient to support an equitable claim for relief. In light of these narrow observations, we concluded the trial court incorrectly determined no cause of action for injunctive relief had been pled and remanded for further proceedings.

V.    THE TRIAL COURT'S SUMMARY JUDGMENT AND EVIDENTIARY RULINGS.

Following remand, appellants filed a second lawsuit asserting the 2011 transfer of funds violated common law and constitutional fiduciary duties and caused damages in the same manner as the 2009 and 2010 transfers. All parties then moved for summary judgment on all five claims. As part of these proceedings, several related issues were raised. Appellants moved to strike evidence submitted by StanCERA on the ground appellants had been prevented from seeking discovery on that same evidence. And StanCERA and County moved to strike portions of the expert declarations submitted by appellants on foundational and gatekeeping grounds.

The trial court granted summary judgment in favor of StanCERA and County and denied appellants' motion. The court noted how "counsel all take the strong position that trial is not necessary and that the main facts are so well established that this matter should on motion be decided as a matter of law" and, upon its own review, reached "the opinion that there are no material disputed issues of fact which would prevent this court from" granting summary judgment. The trial court proceeded to recount appellants' legal argument and took judicial notice of "the 'true signification' of the terms 'amortization'

9.

and 'negative amortization' " before considering the legal implication of the facts asserted. With respect to this analysis, the trial court determined "that Stan[CERA] discharged its fiduciary duties in all respects and in no way abused its discretion" and "that the conduct of Stan[CERA] fully conformed to the requirements of the California Constitution, statutes, and controlling authorities." In doing so, the court found unpersuasive the allegation StanCERA violated article XVI, section 17, subdivision (a) of the California Constitution; any provisions of the County Employees Retirement Law of 1937, including section 31453.5; and any allegation StanCERA violated its fiduciary duties by acting " 'imprudently.' " As the court explained, even if StanCERA's decisions were not "quasi-legislative decisions of the board to which courts give great deference," the evidence provided "no basis for determining that the board breached its fiduciary duties, abused its discretion, or violated a requirement of the California Constitution, statutes, or applicable authorities."

As part of its analysis, the trial court rejected appellants' expert declaration from William Sheffler. The court found Sheffler failed to review the circumstances then prevailing when the board made its decisions, did not explain why he reached his conclusions, and failed to support his opinions through any established standards or any consensus in any relevant expert community. The court also noted Sheffler's opinion had been contradicted by his own deposition testimony and contradictory case law. The court further rejected appellants' argument seeking to exclude evidence from individual board members regarding the circumstances prevailing at the time the board made its decisions, finding exclusion of deliberative process evidence was unnecessary in light of the presumption the board intends the natural and reasonable effect of their enactments. Finally, the court concluded the board was legally permitted to consider the employment interests of StanCERA's active members in reaching its decisions.

This appeal timely followed.

10.

**DISCUSSION**

I.      STANDARDS OF REVIEW.

Appellants contend the trial court wrongly denied their motion for summary judgment and wrongly granted summary judgment in StanCERA's favor. Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) " 'To determine whether triable issues of fact do exist, we independently review the record that was before the trial court. . . .' " (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606.) We review the evidence in the light most favorable to the losing party and resolve any evidentiary doubts and ambiguities in their favor. (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.)

Appellants further contend the trial court improperly excluded expert testimony favoring appellants' position while admitting inadmissible evidence favoring StanCERA. We review a ruling on evidentiary objections for abuse of discretion. (See, e.g., *Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 449; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122; see also *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1122-1123 (conc. opn. of Turner, P.J.) [evidentiary issues in summary judgment proceedings reviewed for abuse of discretion under the majority rule].) The party challenging the ruling has the burden to establish an abuse of discretion. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.) We interfere with the lower court's judgment only if the party can show that no judge could reasonably have made the same judgment. (*Ibid.*; see *Lockhart v. MVM, Inc.* (2009) 175 Cal.App.4th 1452, 1456; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332 [under abuse of discretion standard, court's decision left undisturbed unless it exceeds the bounds of reason].)

II.     THE RELEVANT LEGAL PRINCIPLES.

This case is governed by several related legal principles.  We begin by laying out these principles before applying them to the facts of the case.

A.     CERL.

In *O'Neal I*, we provided a statutory background concerning the laws covering county retirement systems.  We generally repeat that overview here for context, providing additional information regarding provisions and issues relevant to the disputes now before us.

StanCERA was formed and operates under the provisions of the County Employees Retirement Law of 1937 (CERL), section 31450 et seq.[2]  "Under CERL an employee's pension is a combination of a retirement annuity based on the employee's accumulated contributions supplemented by a pension established with county contributions sufficient to equal a specified fraction of the employee's 'final compensation.'  [Citations.]" (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 490.)  Retirement benefits "are funded by employer contributions, employee contributions, and investment earnings on monies deposited in the fund." (79 Ops.Cal.Atty.Gen. 95, 96 (1996).)

The persons who may qualify as annuitants or beneficiaries under the retirement system of a CERL county constitute that county's retirement association. (§ 31474.)  The association is governed by a board, usually (and apparently is in this case) called the board of retirement. (See § 31459, subd. (c).)  The board is required to recommend to the county's board of supervisors a rate of contribution by employees and by the county as employer, at regular intervals, after considering past and expected experience of the association in paying benefits. (See § 31453, subd. (a).)  The board of supervisors is then

---

[2]     Counties are not required to, and many have not, established their retirement plans under CERL. (See *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 433.)

12.

required to establish an appropriation to pay the county's contribution to the pension fund. (§§ 31581, 31584.)

The retirement board's establishment of a contribution rate is to be based on the valuation of the "assets and liabilities of the retirement fund." (§ 31453, subd. (a).) This valuation "shall be conducted under the supervision of an actuary" "at intervals not to exceed three years." (*Ibid.*) The valuation "shall cover the mortality, service, and compensation experience of the members and beneficiaries, and shall evaluate the assets and liabilities of the retirement fund." (*Ibid.*) The retirement board uses these actuarial evaluations of the system, as modified over time, to establish the county's annual pension contribution rate, which is then funded by the county's board of supervisors. (See § 31584.)

In determining the county's contribution rate, a board of retirement may adopt, and StanCERA has adopted, a statutory "normal contribution rate." That normal rate "shall be computed as a level percentage of compensation which, when applied to the future compensation of the average new member entering the system, together with the required member contributions, will be sufficient to provide for the payment of all prospective benefits of such member." (§ 31453.5.)

Relevant to this case, these payments were and continue to be made in full by the relevant employers. However, various circumstances, including an actuarial error and insufficient investment returns, led to a situation where these payments were not sufficient to cover the actuarial liabilities for the fund. To the extent the normal rate does not cover the total liability determined by the actuaries, the board must recommend an additional assessment that will amortize "[t]he portion of liability not provided by the normal contribution rate . . . over a period not to exceed 30 years." (§ 31453.5.)

As noted, one source of funds for the payment of retirement benefits is the income from investment of previous contributions to the retirement fund. When the board of retirement determines the liabilities and assets of the fund, it (guided by its actuary)

13.

makes certain assumptions about liabilities (including the age and final compensation of employees when they retire) and assets (including the interest or rate of return on existing assets as a source of funds to pay benefits). If the investment earnings during a particular year exceed the amount credited by the board to contributions and reserves for that year, these excess earnings "shall remain in the fund as a reserve against deficiencies in interest earnings in other years, losses on investments, and other contingencies, except that, when such surplus exceeds 1 percent of the total assets of the retirement system, the board may transfer all, or any part, of such surplus in excess of 1 percent . . . for the sole purpose of payment of the cost of the benefits described in this chapter." (§ 31592.2, subd. (a).) Among the "benefits described in this chapter" for which excess earnings may be used is the payment of "all, or a portion, of the premiums, dues, or other charges for health benefits" for retirees. (*Id.*, subd. (b).) Retirees have no vested interest in the payment of these supplemental benefits, which are provided at the option of the county. (70 Ops.Cal.Atty.Gen. 1, 4 (1987).) Another of these non-vested benefits is a potential annual increase in cost of living payments when the statutory amount is less than the calculated increase in cost of living for the year. (§ 31874.3, subd. (a).)

      B.      <u>California's Constitution: Article XVI, Section 17.</u>

As a public pension or retirement system instituted under CERL, StanCERA is also subject to several provisions in the California Constitution guiding the operation of such funds. In relevant part, article XVI, section 17 of the California Constitution (hereafter section 17) provides:

> "Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following:

>     "(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner

14.

that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.

"(b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.

"(c) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims."

*1.      History of Relevant Amendments.*

The relevant portions of section 17 reached their current form through two ballot initiatives. The first, Proposition 21, passed in 1984 in an apparent response to the emerging financial markets of the 1980's. Proposition 21 introduced the principle that "assets of a public pension or retirement system are trust funds" which "shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system." (Ballot Pamp., Primary Elec. (June 5, 1984) text of Prop. 21, p. 25, italics omitted.) In addition, it identified several ways in which the fiduciary of those trust funds must act. These included that the fiduciary shall discharge his or her duties with respect to the system "solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system," and "with the care, skill, prudence, and diligence under the circumstances then prevailing

15.

that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims." (*Ibid*., italics omitted.)

In general, Proposition 21 was presented as an amendment which would "delete the specific constitutional restrictions and limitations on the purchase of corporate stock by public retirement systems" that was currently in place, and place within the Legislature authorization to make any desired investments "subject to specified standards of fiduciary responsibility" while also specifying retirement assets as trust funds "held for specified purposes." (Ballot Pamp., Primary Elec., *supra*, proposal of Prop. 21, p. 24.) Indeed, the Argument in Favor of the amendment explained: "Proposition 21 was written to give public pension assets full constitutional protection as trust funds. It guarantees that neither the Governor nor future Legislatures will ever be able to use this money for other purposes." (*Id*., argument in favor of Prop. 21, p. 26.) The argument then explained that the controlling rules, "designed in a different era, often defeat retiree interests today" due to "the recent major changes in the national financial markets: accelerated deregulation, an expanding financial services industry, and many new, special-purpose investment instruments." (*Ibid.*) Proposition 21 was offered to correct this "unanticipated problem by making retiree and pension plan benefits the only proper investment criteria." (Ballot Pamp., Primary Elec., *supra*, argument in favor of Prop. 21, p. 26.) It identified four principles to its goal: making assets trust funds such that "apart from reasonable administrative costs, the only purpose for which these trust assets can be used is the delivery of retirement benefits"; enacting the "sole and exclusive purpose rule[,]" which obligates trustees to perform their duties solely in the interest of plan beneficiaries; making trustees personally liable if they invest without exercising "the degree of care expected of a prudent person, who is knowledgeable in investment matters"; and retaining diversification requirements. (*Ibid*., italics omitted.)

16.

The second major ballot initiative affecting section 17, Proposition 162, passed in 1992 in an apparent response to fears that the Legislature was raiding pension funds to balance their budget.[3] Proposition 162 moved control of pension funds and actuarial services from the Legislature to pension systems by ensuring retirement boards shall have "the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system" and the "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 162, p. 70, italics omitted.) It also introduced the requirement that the board's "duty to its participants and their beneficiaries shall take precedence over any other duty." (*Ibid.*)

The analysis provided for Proposition 162 explained that the current constitutional requirements mandated retirement boards "use fund assets to: (1) provide benefits to members of the system and their beneficiaries, (2) minimize employer contributions, and (3) pay reasonable administrative costs." (Ballot Pamp., Gen. Elec., *supra*, analysis by Legis. Analyst of Prop. 162, p. 37.) The proposed amendment would require boards to continue to honor these three mandates, but would specify "that each board is to give *highest* priority to providing benefits to members and their beneficiaries," potentially resulting in higher costs to employers "if board decisions increase benefits without equal consideration to the cost for those benefits." (*Ibid.*) The arguments in favor of the proposition focused less on these issues and more on arguing the proposition would "STOP POLITICIANS FROM USING PUBLIC PENSION FUNDS TO BAIL THEM OUT WHEN THEY FAIL TO KEEP GOVERNMENT SPENDING UNDER CONTROL" (*id.*, rebuttal to argument against Prop. 162, p. 39), claiming it was "morally

---

[3] Interestingly, opponents argued that increased autonomy to pension boards would mean that "in future budget crises, retirement costs could soar while vital public services are cut to the bone," potentially predicting the dispute here. (Ballot Pamp., Gen. Elec. (Nov. 3, 1992) argument against Prop. 162, p. 39.)

wrong and unfair to take [the dignity and security of an earned pension] away from [retirees]" (*id*., argument in favor of Prop. 162, p. 38, boldface omitted).

  2. *Cases considering section 17.*

Prior to the enactment of Proposition 162, section 17 was partially analyzed in two applicable cases: *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470 (*City of Sacramento*) and *Claypool v. Wilson* (1992) 4 Cal.App.4th 646 (*Claypool*).

In *City of Sacramento* the court considered whether conduct by the board of the Public Employees Retirement System (PERS) in classifying overtime pay owed under the Fair Labor Standards Act as nonovertime compensation was permissible and in accord with section 17's duty to minimize employer contributions. (*City of Sacramento*, *supra*, 229 Cal.App.3d at pp. 1475-1476, 1493.) The court found the challenged classification did not violate section 17 despite increasing employer costs because, even if a duty to minimize employer contributions were found, it could not "be construed to require PERS to manage the retirement system in a way which would favor an employer over the beneficiaries to whom it owes a fiduciary duty." (*City of Sacramento*, *supra*, at p. 1493.) To reach this conclusion, the court relied on the designation of retirement funds as trust funds and the common law, "well-established rules of the law of trusts," which hold that "a trustee's primary duty of loyalty is to the beneficiaries of the trust" and must be exercised " 'to the exclusion of the interest of all other parties.' " (*Id.* at p. 1494.) In light of the controlling duty of loyalty, "a 'fiduciary cannot contend "that although he had conflicting interest, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." ' " (*Ibid.*) In other words, any duty the board may have to minimize employer contributions "may not take precedence over its duty to the beneficiaries of the system." (*Ibid.*) Thus, while not holding the board was required to act in the manner it did, the court concluded no competing constitutional

provision could require the board to act in a manner detrimental to its beneficiaries. (*Ibid.*)

*Claypool* involved a dispute arising when statutory modifications to PERS repealed three previously funded supplemental cost of living programs and directed the funds previously attributable to those programs be used to offset contributions otherwise due from PERS employers. (*Claypool*, *supra*, 4 Cal.App.4th at p. 652.) One of the arguments in that case claimed transferring funds previously designated for cost of living payments to cover employer contributions violated the constitutional mandate that "assets of a public pension or retirement system are trust funds." (*Ibid.*; see *id.* at pp. 657-658, 673.)[4]

In a lengthy historical recitation of changes to the PERS system, the court noted that the cost of living funds had been initially diverted from excess funds contained in a deficiency-reserve account before being redirected through multiple funds designed to assist pension payments with retaining their purchasing power over time. (*Claypool*, *supra*, 4 Cal.App.4th at pp. 653-658.) The court found the valid repeal of the statutes diverting these cost of living funds "created a unique fund" in which the "moneys were not previously counted toward the actuarial soundness of PERS, were not reserved to underwrite the actuarial soundness of the basic pension benefits, and are not now tied to the provision of any special benefits required to be paid." (*Id.* at p. 671, fn. omitted.)

In light of this history, the court readily rejected the constitutional trust fund argument without delving heavily into the meaning of section 17. According to the court, use of funds already held by the PERS trust to cover employer obligations could not be

---

**4**    In a separate argument contending other statutory changes improperly created an incurable conflict of interest between the Governor and the program's actuary under trust-based fiduciary duties, the court assumed, without finding, "that . . . section 17 . . . imports the existing law of trusts." (*Claypool*, *supra*, 4 Cal.App.4th at p. 676.) It then applied various provisions of the Probate Code and the common law to find no such conflict arose. (*Claypool*, *supra*, at pp. 676-677.)

construed as a raid upon the trust itself, in violation of the mandate that trust funds be used solely for the delivery of retirement benefits, because "the money has not been diverted from the system and is to be used for the purposes authorized by the California Constitution." (*Claypool*, *supra*, 4 Cal.App.4th at p. 673, fn. omitted.) In other words, the funds always remained available to pay retirement benefits. As the court explained, the "use of these funds to meet the employers' continuing funding obligation is no more proscribed by . . . section 17 . . . than is the use of earnings attributable to the employer accounts of the PERS fund for the same purpose." (*Id.* at p. 674.) The court did not, however, consider whether such use of funds violated any fiduciary duties, noting such a claim was a digression given the case involved legislative limitations and not the actions of fiduciaries. (*Id.* at p. 673, fn. 9.)

Following enactment of Proposition 162, *Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140 (*Bandt*) again looked at section 17. The dispute in *Bandt* developed when the County of San Diego agreed to increase county pension benefits by an actuarial value of approximately $1.1 billion. (*Bandt*, *supra*, at p. 143.) To offset this rise in costs, the county decided to voluntarily reduce the unfunded liability in the pension fund through the issuance of $550 million in bonds. (*Id.* at p. 144.) There was a delay due to litigation in depositing these funds, causing the retirement fund's annual valuation to not include that sum in its assets and resulting in an increase in the amount of the employer contribution necessary to support the fund. (*Ibid.*) In response, after the deposit was made, the county asked for an interim evaluation which would consider the deposited funds as assets and, relatedly, reduce the county's employer contribution requirement. (*Ibid.*) The lawsuit was filed after this request was granted, on the premise that the retirement board had a constitutional duty to maximize the assets of the trust fund and, therefore, could not reduce the previously set employer contribution through an interim valuation. (*Id.* at p. 145.) In a bench trial on this claim, the trial court found the board had acted in the interest of its members in conducting the interim evaluation and setting a

20.

longer repayment period in light of the fact the county increased benefits, paid off half of the liability for that increase in one year, and faced the prospect of having to lay off employees due to financial difficulties. (*Ibid.*)

The appellate court affirmed this conclusion. Looking at section 17, the court found subdivision (b)'s mandate that the retirement board's "duty to its participants and their beneficiaries shall take precedence over any other duty" was ambiguous as to the manner in which that duty must be prioritized. (*Bandt*, *supra*, 136 Cal.App.4th at p. 151.) Looking at the fact Proposition 162 had been proposed as a response to a bill permitting the Legislature to use reserve funds in a retirement system to help balance the budget and that the Legislative Analyst noted benefits were being placed as the duty of highest priority, the court readily found Proposition 162 "intended to provide that a retirement board's duty to its participants and members was paramount, and thus must be placed above any purpose to minimize employer contributions." (*Bandt*, *supra*, at p. 154.) However, the court found ambiguity regarding whether, under Proposition 162, a retirement board had "a secondary duty to minimize employer contributions" which must be subjugated to the primary duty. (*Bandt*, *supra*, at p. 155.) It also found ambiguity concerning the "constitutional standard by which this court should determine whether a retirement board has violated its constitutional mandate by acting in a manner contrary to the interest of its members," analogizing the issue to corporate governance's deferential business judgment rule before refusing to resolve the issue. (*Id*. at p. 156.)

Regardless of any ambiguities, the appellate court ultimately found the board did not violate their duty to act in the best interests of their members. The court's conclusion turned on facts demonstrating the board's actions caused no material harm to the retirement fund's members under any applicable standard of review and, in fact, acted in a manner benefiting members. Although the plan's unfunded liability increased due to the board's actions, this was not a de facto demonstration of harm to the membership because the rise occurred due to an overall increase in benefits. (*Bandt*, *supra*, 136

21.

Cal.App.4th at p. 157.) Likewise, utilizing an interim evaluation to recalculate payments did not create a material harm because the evidence demonstrated the 15-year timeline adopted for amortizing the recalculated unfunded liability " 'would allow for all current unfunded liabilities to be funded on average by the time needed to make payments to the current active employees,' " meaning no benefits would be reduced. (*Ibid.*) With respect to actual benefits to the membership, accepting the interim valuation would likely cause the county to trust that the board was considering its potential duty to minimize employer contributions when possible and would preserve up to 1,500 jobs held by members. (*Id.* at pp. 158-159.) This final consideration was permissibly considered because "a member's interest as an employee is clearly related to his interest as a pension beneficiary" and "job losses could also negatively impact the financial condition of the retirement fund." (*Id.* at p. 159.) In light of these findings, there was no conduct taken which violated the board's constitutionally defined fiduciary duties.

      C.    <u>The law of trusts.</u>

Under the Probate Code, the term " '[t]rust' " excludes "[t]rusts for the primary purpose of paying debts, dividends, interest, salaries, wages, profits, pensions, or employee benefits of any kind." (Probate Code, § 82, subd. (b)(13).) As an early version of this statute was added to the Probate Code by Statutes 1983, chapter 842, section 21, the statutory definition excluded trusts for paying pension funds prior to enactment of Proposition 21 and its constitutional definition of public pensions as trust funds. (Cal. Law Revision Com. com., 52 West's Ann. Prob. Code (2002 ed.) foll. § 82.) Despite this timing, no court has expressly concluded all provisions of the Probate Code governing trusts also govern retirement boards. Although several courts have cited statutory provisions for support of their analysis, at least one court has rejected the request to invoke certain statutory provisions regarding the removal of trustees. (See *Meyers v. The Retirement Fund of Federated City Employees* (2014) 223 Cal.App.4th 1201, 1210-1212 [finding no statutory or common law reason to apply Prob. Code provisions for removal

of trustees to retirement fund].)  What appears consistent throughout the relevant case law, however, is that the designation of retirement funds as trust funds and the express recognition of fiduciary duties related to management of those funds adds weight to the authority of the common law and statutory doctrines concerning actions taken by those overseeing trust funds.  (See 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 6, p. 572 ["A pension plan creates two relationships:  (a) a contractual relationship between the employer and the employee, and (b) a trust relationship between the pensioner and the trustee administering the plan."].)

We agree with this willingness to consider and apply well-settled principles governing trust fiduciaries.  Application of such principles ensures the amendments made by Proposition 21 designating public pension and retirement funds as trust funds are given their full weight in light of the history leading to their adoption.  At the same time, application of these principles in the context of the fiduciary duties identified in section 17 comports with how the Probate Code itself views Probate Code section 82's definitional exclusion of pension funds from the trust laws.  (Probate Code, §§ 15002 ["Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state."]; 15003, subd. (c) ["Nothing in this division or [Probate Code s]ection 82 is intended to prevent the application of all or part of the principles or procedures of this division to an entity or relationship that is excluded from the definition of 'trust' provided by [Probate Code s]ection 82 where these principles or procedures are applied pursuant to statutory or common law principles, by court order or rule, or by contract."].)  To the extent section 17 directs fiduciaries to behave in a manner consistent with the common law or the Probate Code, the law of trusts is a valuable tool to consider.

While we need not identify every duty which may fall within this conclusion, it is clear from the text of section 17 that, at a minimum, we must review the duties of trust fiduciaries to act for the benefit of and hold trust funds for their beneficiaries.  (See § 17,

23.

subds. (a), (b) [identifying the following fiduciary responsibilities: "the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system"; "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries"; holding funds "for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system"; discharging duties "solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system"; and determining the "board's duty to its participants and their beneficiaries shall take precedence over any other duty"].)

1. *Duties constraining powers granted by the trust instrument.*

As an initial guideline, a trustee "has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." (Rest.3d Trusts, § 76; accord, Prob. Code, § 16000 [providing the "trustee has a duty to administer the trust according to the trust instrument" and trust law].) "Because of this combination of duties, the fiduciary duties of trusteeship sometimes override or limit the effect of a trustee's duty to comply with trust provisions; conversely, the normal standards of trustee conduct prescribed by trust fiduciary law may, at least to some extent, be modified by the terms of the trust." (Rest.3d Trusts, § 76, com. b, p. 69.) In cases where a trustee is given discretionary powers, the trustee's exercise of that discretion "is subject to supervision by a court only to prevent abuse of discretion." (Rest.3d Trusts, § 87.) However, the "grant of a power to a trustee, whether by the trust instrument, by statute, or by the court, does not in itself require or permit the exercise of the power. The exercise of a power by a trustee is subject to the trustee's fiduciary duties." (Prob. Code, § 16202; accord, Rest.3d Trusts, § 87, com. a, pp. 242-243.) Indeed, the Restatement Third of Trusts comments that "an abuse of discretion occurs when a trustee acts from an

24.

improper even though not dishonest motive, such as when the act is undertaken in good faith but for a purpose other than to further the purposes of the trust or, more specifically, the purposes for which the power was granted." (Rest.3d Trusts, § 87, com. c, p. 244.)

With this guidance in mind, we turn to the most stringent duty imposed by the law of trusts, the duty of loyalty. According to the Restatement Third of Trusts section 78, subdivision 1, "[e]xcept as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust solely in the interest of the beneficiaries." (Accord, Prob. Code, § 16002, subd. (a) ["The trustee has a duty to administer the trust solely in the interest of the beneficiaries."].) Although this duty is frequently invoked as a protection against creating conflicts between a trustee's fiduciary duties and personal interests, it is also understood to protect against improper influence generally. Thus, actions by a trustee may be considered improper if they are taken "either for the purpose of benefiting a third person (whether or not a party to the transaction) rather than the trust estate or for the purpose of advancing an objective other than the purposes of the trust." (Rest.3d Trusts, § 78, com. f, p. 109; accord, Prob. Code, § 16004, subd. (a) ["The trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust . . . ."].) This duty of loyalty strongly parallels provisions of section 17 added by Proposition 21 and amended by Proposition 162. (§ 17, subd. (b) ["The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty."].)

Related to this duty, although less important to the purposes of this case, is the duty of prudence, which requires the trustee "to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust." (Rest.3d

25.

Trusts, § 77, subd. (1).) As an overall guideline for how trustees should act, both in investing and general administration of the trust, this duty dovetails with the general standard of care imposed upon trustees under the Probate Code to "administer the trust with reasonable care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." (Prob. Code, § 16040, subd. (a), but see *id*., subd. (c) [this standard does not apply to investments in California, which are governed by the Uniform Prudent Investor Act].) As with the duty of loyalty, this duty strongly parallels the text of section 17. (§ 17, subd. (c) ["The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims."].)[5]

With these general legal principles considered, we turn to the arguments presented by the parties.

III.    APPELLANTS WERE NOT ENTITLED TO SUMMARY JUDGMENT.

Appellants argue the trial court erred in failing to grant their motion for summary judgment. Tied to this argument is the assumption that there were no material facts in issue and the law required judgment in appellants' favor. Thus, resolution of this issue will generally inform whether the trial court properly awarded summary judgment to StanCERA and County. For this reason, we frame the analysis in the context of

---

[5]    These parallels are to be expected in light of the history showing section 17 was amended to mirror successful past practices in the federal system. (Ballot Pamp., Primary Elec., *supra*, argument in favor of Prop. 21, p. 26 [noting trust fund proposal was modeled on extensive federal government experience in this area and was already a key part in over 600,000 private pension plans].)

appellants' arguments while recognizing that StanCERA and County have raised additional points, which will be considered as needed.

A.      *O'Neal I* does not resolve this case.

Appellants argue this case should have been resolved in their favor in light of our prior decision in *O'Neal I*.  Under this argument, appellants contend proving the facts alleged in the operative complaints legally requires injunctive relief, absent proof of some affirmative defense.  In support of this argument, appellants attempt to demonstrate the core conduct alleged in their complaints was undisputed (i.e., that StanCERA made the four contested transfers of non-valuation funds to offset County's employer contributions and adopted an amortization scheme which included negative amortization despite underfunding in the plan).  Appellants then argue that proof of this conduct is sufficient to grant summary judgment in their favor because the conduct is undisputedly contrary to the law and therefore a de facto violation of StanCERA's fiduciary duties.  Although initially invoking the law of the case doctrine, appellants' argument demonstrates an understanding this doctrine is not applicable.  Indeed, appellants' argument confirms that summary judgment would only be properly granted if the undisputed conduct in this case violated StanCERA's fiduciary duties as a matter of law.  This is consistent with our statement in *O'Neal I* that, while appellants' allegation of a breach of fiduciary duty stated a valid claim, those allegations still needed to be proven.  As further developed, *post*, that some underlying facts are undisputed does not mean the existence of a breach of duty is undisputed.  We thus first consider whether appellants showed a breach of duty as a matter of law.

B.      Appellants' improper transfer claims.

Although spread across four claims for relief, appellants have identified two types of transfers, which appellants contend violate statutory restrictions.  In the first, non-valuation reserve funds are transferred to valuation reserve funds, thus taking money that was not previously included in the actuarial calculations and adding it to the asset column

of the pension system. The transfer indirectly affects the employer's obligations by reducing the amount of unfunded liabilities. In the second, non-valuation reserve funds are removed from the reserves and utilized to directly pay employer obligations related to the amortization of unfunded liabilities. The funds replace employer funds that would have otherwise been required to be added to the actuarial assets. Although the impact of these actions is different, we find no distinction between the two in the context of the legal authority to conduct the transfer. In neither case has the transfer broken the law.

Appellants claim both CERL and an opinion from the Attorney General explicitly bar the transfers made in this case. We do not agree. The provisions of CERL covering excess earnings concern how excess earnings realized within a single year may be managed. When initially realized, excess earnings must be kept "as a reserve against deficiencies in interest earnings in other years, losses on investments and other contingencies." (§ 31592.) However, once the excess earnings exceed a statutory minimum, they may be transferred out of the general reserve fund and into a county advance reserve fund. That separate fund, once established, shall be used "for the sole purpose of payment of the cost of the benefits" described by the CERL. (§ 31592.2, subd. (a).)

Consistent with this statutory mandate, when excess earnings above 1 percent of the retirement system's assets are earned in any given year, the Attorney General has opined these funds cannot be transferred out of the general valuation reserve fund and into the county advance reserve fund to directly cover employer contribution payments. (79 Ops.Cal.Atty.Gen., *supra*, at p. 98.) However, the Attorney General believes such funds may be used to pay a portion of the pension system's liabilities (the actual retirement benefits owed) and in that way both directly reduce the overall liability in the system and indirectly reduce employer payments calculated off of those liabilities. (*Ibid*.; see *id*. at pp. 101-102 ["Looking first to the language of section 31592.2, we find that when earnings are in excess of 1 percent of the total assets of the retirement system, 'the

28.

board may transfer all, or any part, of such surplus in excess of 1 percent of the said total assets into county advance reserves for the sole purpose of payment of the cost of the benefits described in this chapter.' The 'benefits described in this chapter' are the benefits to which a system member is entitled at retirement. The cost of these benefits is incurred by the retirement system as an entity separate from the county and independently administered by the retirement board."].)

The statutory guidance and interpretation from the Attorney General do not explicitly cover the facts in this case. Here, funds which were diverted from the general reserves to county advance reserves in past years were removed from the separate funds they had been placed into and used to offset the effect of increasing plan liabilities either by increasing the plan's assets or by substituting non-valuation funds for payments required from employers. While there is ample statutory guidance on how to manage excess funds in a specific year, and on how to use funds when removed from the general reserves, these laws do not dictate whether those excess funds, once removed, must permanently remain within the county reserve funds or whether they may be returned to the retirement fund "as a reserve against deficiencies in interest earnings in other years, losses on investments[,] and other contingencies." (§§ 31592, 31592.2, subd. (a).) Similarly, we have been pointed to no opinion from the Attorney General considering whether an advance county reserve fund can be closed, or have existing money transferred out of it, for uses not authorized by the statute allowing the initial transfer. As such, while the Attorney General's opinion is valuable to understanding the scope of obligations placed upon the board, it is not controlling where pre-existing funds are intentionally removed from a county advance reserve fund.

In light of this lack of authority, the question remains whether the transfer was per se illegal. We conclude it was not. The board has been granted plenary authority over administration and investment decisions concerning the retirement system, subject to its fiduciary duties. (*City of San Diego v. San Diego City Employees' Retirement System*

(2010) 186 Cal.App.4th 69, 78-79.) With no statutory authority to the contrary, we see no reason why the board could not, if consistent with its fiduciary obligations, close or reduce a county advance reserve excess fund account and utilize that money for a different purpose. The funds are not being utilized to keep the system in actuarial balance and, assuming the funds remain within the retirement system, are not being improperly diverted from the trust as a whole.

In the generally parallel circumstances presented in *Claypool*, where cost of living funds originally diverted from a reserve against deficiencies were statutorily closed and used to cover required employer obligations, the court determined such non-valuation funds could be used to supplement employer contributions without violating contractual or constitutional rights to the continued funding and protection of trust assets. (*Claypool*, *supra*, 4 Cal.App.4th at pp. 671-674.) Of course, because the issue was ancillary to the appropriateness of the Legislature's actions, the court noted its determination had no bearing on whether such transfers were consistent with any fiduciary obligations owed under other constitutional provisions. (*Id.* at p. 673, fn. 9.) While the question in this case is whether the board could choose to transfer out only a portion of the excess funds in the county advance reserve, the analysis in *Claypool* applies here. The board has the authority to close or reduce non-valuation accounts and apply those funds to offset employer obligations either directly or indirectly, provided it acts in line with its fiduciary obligations. (*Id.* at p. 674 ["The use of these funds to meet the employers' continuing funding obligation is no more proscribed by . . . section 17 . . . than is the use of earnings attributable to the employer accounts of the PERS fund for the same purpose."].)

Having reached this conclusion, it follows that appellants were not entitled to summary judgment on these claims. There is no constitutional or statutory barrier to the underlying decision to reduce or close non-valuation reserve, excess-funds accounts and to use those funds to offset required employer contributions. However, such decisions are subject to the board's constitutional, and common law fiduciary duties.

30.

C.     Appellants' negative amortization claim.

Appellants also allege summary judgment should have been granted on claim 3 because it is illegal to adopt an amortization schedule which includes a negative amortization rate and, therefore, adopting such a schedule is a breach of fiduciary duty. In particular, appellants contend section 31453.5 precludes the adoption of any amortization schedule which includes negative amortization.  We disagree.

Section 31453.5 allows for the portion of a plan's liability that is not covered by the normal contribution rate defined in that section to "be amortized over a period not to exceed 30 years." (*Ibid*.)  Relying on Black's Law Dictionary (9th ed. 2009) at page 99 to define "amortization" as "[t]he act or result of gradually extinguishing a debt, such as a mortgage, usu[ally] by contributing payments of principal each time a periodic interest payment is due," appellants claim the adoption of a policy which does not pay down principal at all times does not qualify as amortization.

" ' "[W]e begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent." [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.' [Citation.]  In interpreting a statutory provision, 'our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results.' " (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384-1385.)

In this case, we need go no further than the plain language of the statute. Unfunded liability must be "amortized *over a period not to exceed 30 years*." (§ 31453.5, italics added.)  Appellants' complaint about the existence of a period of negative amortization focuses too narrowly on the word amortized, ignoring the broader

31.

context of the statute. There is no reason, under the plain language of the statute, why a negative amortization period cannot exist, provided the overall amortization schedule eliminates the unfunded liabilities over a period not to exceed 30 years.**6** Nothing in the definition of amortization prevents or conflicts with such a reading.

Having concluded adopting an amortization schedule which includes a period of negative amortization does not violate section 31453.5, it follows that appellants were not entitled to summary judgment on this claim. Rather, as with appellants' other claims, the only limitations on the board's decisions are the board's fiduciary obligations to its members.

## IV. STANCERA AND COUNTY WERE NOT ENTITLED TO SUMMARY JUDGMENT.

Although the facts do not show a per se violation of law, the question remains whether the trial court properly granted summary judgment to StanCERA and County on the evidence presented. In considering this question, we summarize the cause of action for a breach of fiduciary duty and relevant principles arising at the summary judgment stage of such claims. We then apply those principles to the facts of this case to determine whether no material issues of fact remain.

### A. Breach of fiduciary duty claims and summary judgment principles.

"The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach." (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1405.) Although subject to exceptions, the determination whether a breach of fiduciary duty occurs under

---

**6** Appellants do not argue, and we take no position on whether, the adoption of the amortization schedule in this case, which included not only an initial negative amortization period but reset the pay-down period to 30 years each year, violated the 30-year period requirement of the statute. We merely conclude, contrary to appellants' position, that the presence of a negative amortization period does not make the schedule illegal per se.

a particular set of facts is " 'mainly for the trier of facts.' " (*Mueller v. MacBan* (1976) 62 Cal.App.3d 258, 276; see *Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 915 [" 'Whether a fiduciary duty exists is generally a question of law. [Citation.] Whether the defendant breached that duty towards the plaintiff *is a question of fact*. [Citation.]' "]; *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 822 ["Breach of duty is usually a fact issue for the jury. [Citation.] Breach may be resolved as a matter of law, however, if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him or her."].) Expert testimony demonstrating a breach is not required, but is admissible in circumstances where the conduct supporting the alleged breach is beyond common knowledge. (See *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1087.)

As a preliminary matter, StanCERA argues the breaches alleged in this case arose from discretionary decisions taken by the board and, thus, are entitled to deference such that the board must be upheld if reasonable minds could disagree as to the wisdom of the board's actions. We do not agree. While it is true that the board acts under a grant of plenary authority to administer the retirement system, this grant of discretion is not absolute. As StanCERA admits, we explained in *O'Neal I* "the allegation in the amended complaint that respondent breached its fiduciary duty is, in the circumstances of this case, the legal equivalent of an allegation that respondent's actions were a breach of discretion, since respondent's board does not have lawful discretion to act in contravention of its constitutional duties." This conclusion was consistent with the law of trusts and the case law. (See Prob. Code, §§ 16081, subd. (a) ["[I]f a trust instrument confers 'absolute,' 'sole,' or 'uncontrolled' discretion on a trustee, the trustee shall act in accordance with fiduciary principles and shall not act in bad faith or in disregard of the purposes of the trust."]; 16202 ["The grant of a power to a trustee, whether by the trust instrument, by statute, or by the court, does not in itself require or permit the exercise of the power. The exercise of a power by a trustee is subject to the trustee's fiduciary duties."]; *City of*

*Sacramento*, *supra*, 229 Cal.App.3d at p. 1494 [" 'The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.' "].) It confirms that a breach of a trustee's fiduciary duty, if proven, demonstrates a breach of discretion, as a trustee's discretion is necessarily constrained by any fiduciary obligations. (See Rest.3d Trusts, §§ 70, 86.)

Thus, to be entitled to summary judgment, StanCERA and County must demonstrate one or more elements of a breach of fiduciary duty claim "cannot be established, or that there is a complete defense to that cause of action." (*Palm Springs Villas II Homeowners Assn., Inc. v. Parth* (2016) 248 Cal.App.4th 268, 278.) Unlike in cases where interpretation of the relevant statutory requirements can resolve whether disputed conduct was proper, in the present context of an alleged breach of fiduciary duty, StanCERA's argument requires demonstrating a lack of evidence exists which could be interpreted by the trier of fact as reflecting conduct contrary to StanCERA's fiduciary duties. Only if this burden is met will the burden shift to appellants " ' "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." ' " (*Ibid.*) " 'Because a summary judgment denies the adversary party a trial, it should be granted with caution.' " (*Ibid.*)

As a second preliminary matter, County alleges appellants have waived their right to appeal the summary judgment granted on County's motion, which alleged a lack of evidence to support appellants' claims, for failure to appropriately raise the issue on appeal. In the same vein, appellants allege StanCERA's motion for summary judgment was procedurally flawed and thus could not support the trial court's determination because it did not identify a basis upon which summary judgment could be granted. We disagree with both contentions.

With respect to appellants' contentions on appeal, although appellants put virtually no argument toward directly opposing County's motion, the issues behind appellants' main arguments overlap as between StanCERA and County. Moreover, while appellants

34.

focus primarily on legal issues supporting their contention the trial court erroneously denied their summary judgment motion, appellants also identify evidence supporting their position that StanCERA violated its fiduciary obligations and thereby harmed the trust corpus. In this way, appellants have challenged the grant of summary judgment to StanCERA and County based on the evidence presented before the trial court, even if only weakly. As the trial court's summary judgment determination concluded there were no material issues of fact and the facts were insufficient to support a breach of fiduciary duty finding, we conclude the appropriateness of the trial court's ruling has been preserved on appeal.

With respect to StanCERA's original summary judgment motion, StanCERA rightly points out its motion clearly identified the bases upon which it sought judgment as a matter of law and how those bases correspond to the judgment entered by the trial court. We see no validity in appellants' argument the underlying motion was procedurally defective.

With these issues resolved, we turn to appellants' five claims. StanCERA and County contend the facts are insufficient to demonstrate either a breach of fiduciary duty or damages.

B.     Appellants' improper transfer claims.

As noted, *ante*, appellants' improper transfer claims involve two distinct factual scenarios. For both types of transfers, when taken in the light most favorable to appellants, the evidence shows an actuarial calculation of employer contributions was made, which was higher than ultimately required after the transfers. Following this initial actuarial calculation, StanCERA received letters from County and other employers identifying funding shortfalls within the employers' budgets which would cause budget crises if the proposed employer contributions were not reduced. Included in these letters were reminders from County of past instances in which it had worked with StanCERA to the benefit of StanCERA's members. In response to these letters, StanCERA made the

35.

disputed transfers, lowering the employers' liabilities under an amended actuarial calculation or directly paying a portion of those liabilities. As a result, two funds dedicated to paying discretionary supplemental benefits were substantially diminished.

Pointing to StanCERA's contention its conduct helped "participating employers manage a crisis in the short term" and the claim that County leveraged its past support for StanCERA members to its advantage, appellants argue a breach of fiduciary duty occurred when StanCERA placed County interests above the interest of its members, resulting in a so-called pension raid on the supplemental funds. While we have rejected the legal bases upon which appellants sought summary judgment, taking the evidence in the light most favorable to appellants there is a material issue of fact regarding whether StanCERA's conduct breached its constitutional fiduciary duties, thereby causing damage to appellants.

We find *City of Sacramento*, *supra*, 229 Cal.App.3d 1470, instructive in this instance. Under section 17, subdivision (b) the fiduciaries of a public pension or retirement system must discharge their duties "solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." Relying on the history of this constitutional provision, the court in *City of Sacramento* explained how, even if this provision creates a duty to minimize employer contributions, its express determination that the duty to a plan's participants shall take precedence cannot mean the fiduciaries may "manage the retirement system in a way which would favor an employer over the beneficiaries to whom it owes a fiduciary duty." (*City of Sacramento*, *supra*, 229 Cal.App.3d at p. 1493.) This principle is consistent with the common law fiduciary duty of loyalty. As noted, *ante*, this common law duty could render otherwise proper conduct a breach of fiduciary duty upon a showing the conduct was taken "either for the purpose

36.

of benefiting a third person (whether or not a party to the transaction) rather than the trust estate or for the purpose of advancing an objective other than the purposes of the trust." (Rest.3d Trusts, § 78, com. f, p. 109.) As the court in *City of Sacramento* succinctly noted, in the face of facts showing an improper influence "a 'fiduciary cannot contend "that although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." ' " (*City of Sacramento*, *supra*, 229 Cal.App.3d at p. 1494.)

In this case, the evidence, when viewed most favorably to appellants, could support an inference that StanCERA took steps to reduce the employer contributions owed under its actuarial calculations based on the financial interests of the employers and the threat of reduced cooperation from County in the future. This is, at least in part, because before these additional interests were presented to StanCERA a higher contribution was set. In their responsive briefing, StanCERA and County provide a significant amount of evidence supporting a competing conclusion, that StanCERA reasonably took employer troubles into account in order to prevent job losses to StanCERA members and, thus, was acting exclusively in its members' interests. Although appellants contend such evidence is irrelevant, the case law does not support this claim.

As part of the appeal following a trial on the merits in the *Bandt* case, the court expressly affirmed a retirement board could consider its active members' interests in retaining their jobs when making funding decisions. (*Bandt*, *supra*, 136 Cal.App.4th at p. 159.) As the court explained, even "assuming appellants are correct in asserting that the Board's sole duty is to protect members' interests as beneficiaries, the pension of a member who loses his job will be dramatically affected by that job loss. Thus, a member's interest as an employee is clearly related to his interest as a pension beneficiary." (*Ibid.*) We agree with that analysis. A trier of fact could view conduct preserving current jobs as good for current retirees who rely on continuing contributions

37.

to ensure the viability of their retirement. But, as we also noted in *O'Neal I*, the procedural posture in *Bandt* is a distinguishing factor which precludes that case from resolving the appropriateness of StanCERA's conduct as a matter of law. *Bandt* involved a scenario where the trial court had taken all relevant evidence and weighed it as the trier of fact. In this case, we are considering the matter on summary judgment, where all facts and reasonable inferences are taken in the non-moving party's favor. Thus, while it is permissible for StanCERA to consider job losses, it would be improper at this stage to rely on this permissive conduct to negate any reasonable inferences from the evidence that other motives, impermissible under the California Constitution and trust law, may also have been considered. In other words, the evidence marshalled by County and StanCERA only highlights the material issue of fact concerning whether StanCERA breached its duty of loyalty to its members by placing employer interests above member interests.[7]

County further contends appellants have no evidence of damages. We disagree. At a minimum, appellants have demonstrated a reduction occurred to supplemental benefit non-reserve funds which reduced the funding in those accounts. This reduction was a result of an alleged breach of fiduciary duty by the board and calls into question

---

[7] Appellants imply another breach in the form of a raid on the trust funds supporting vested benefits, by way of the reduction of employer funds being brought in to fund those accounts. We note that, absent breach of a separate fiduciary duty, the transfer of moneys from funds not used to keep a system in actuarial soundness to the actuarially relevant accounts is not a breach of the duty to treat retirement funds as trust funds, even if such funds are used to cover employer obligations. (*Claypool*, *supra*, 4 Cal.App.4th at pp. 673-674 & fn. 9 [explaining the use of non-valuation "funds to meet the employers' continuing funding obligation is no more proscribed by . . . section 17, [subdivision (a)] than is the use of earnings attributable to the employer accounts of the PERS fund for the same purpose" but noting its holding does not extend to claims under subdivision (b)].) As a result, allegations of a breach of the obligation to treat funds as trust funds and claims of damages to the vested pension fund through the loss of outside funds to the system's general benefit accounts are properly precluded by the trial court's grant of summary judgment.

whether such discretionary payments could ever be reinstated, regardless of their discretionary nature. If a breach of fiduciary duty is proven there is little weight in the argument that these non-valuation accounts could have been closed or that StanCERA could have voluntarily chosen to cease payments from them, the reduction in value would be due to the breach, not any lawful act, and therefore would constitutes damages.[8] (See *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 906 [noting, in the context of a breach of loyalty, which was allegedly consistent with the prudent investor rule, it "is no defense that the trustee acted in good faith, that the terms of the transaction were fair, or that the trust suffered no loss or the trustee received no profit"].) In other words, while StanCERA has no fiduciary obligation to pay non-vested benefits, it does have a duty to maintain those trust funds according to its fiduciary responsibilities.[9] If the trust fund corpus is reduced due to a breach of those duties, as opposed to a lawful reason, damages can be demonstrated through a reduction of funds that would otherwise be present absent a breach. There is thus evidence in the record to support a damages claim resulting from an alleged breach of the duty of loyalty.

---

[8]     The parties extensively consider whether injunctive relief is appropriate in the form of unwinding the contested transfers. StanCERA argues the balance of the equities in this case would preclude any transfer of funds from County to the retirement fund, or from valuation to non-valuation reserves within the overall system. Appellants oppose, claiming the equities do, in fact, support such relief. This dispute is premature as material issues of fact exist concerning whether a breach of fiduciary duty exists and the trial court has made no findings regarding equitable relief. Upon remand, and assuming a breach is found by the trier of fact, the trial court will have the ability to take evidence on and weigh the equities to determine whether an injunction is proper.

[9]     For this reason, we find County's citations to *Chaidez v. Board of Administration etc.* (2014) 223 Cal.App.4th 1425 and *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522 distinguishable. Both cases dealt with an alleged obligation to pay benefits higher than statutorily required, not with the duty to properly manage the underlying funds which would support those payments.

C.     Appellants' negative amortization claim.

Appellants' negative amortization claim arises because StanCERA made three changes to the manner in which it calculated the amortization payments required on unfunded liability.  The first change was to extend the amortization period to 30 years.  The second change made the payments based upon a level percent of pay schedule.  The third change ensured that the 30-year amortization period would reset each year for at least three years.  In proceedings following the third change, the amortization period was reset, but also shortened, although it retained an initial negative amortization period.  As noted, *ante*, in the context of the negative amortization rate, in isolation, none of these changes is per se illegal.  The question remains, however, whether sufficient evidence exists to demonstrate this otherwise legal conduct was taken as a result of a breach of fiduciary duties owed by the board.

With respect to this claim, when taking all reasonable inferences in appellants' favor, at least two possibilities arise for finding a breach of fiduciary duty.[10]  First, consistent with our discussion of the allegedly improper transfer claims, *ante*, the evidence could be viewed to suggest StanCERA adopted the three changes to its amortization schedule in order to alleviate burdens on its employers brought on by the global downturn of the time.  While there remains contradictory evidence, a determination regarding whether the motive for StanCERA's conduct placed the employers' interests above its members is a factual issue.

---

[10]     Appellants argue the negative amortization period was "imprudent."  However, given our decision to affirm the exclusion of Sheffler's expert report, *post*, this theory is not sustainable.  The only evidence submitted on this theory comes from County and demonstrates that negative amortization schedules have been adopted by other retirement funds.  It thus fails to sustain even an inference that the board failed to discharge its "duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims."  (§ 17, subd. (c).)

Second, by both extending the period for amortizing the debt and switching to a level percent of pay schedule, the evidence could be viewed to show the board ensured a substantial period of negative amortization would occur and that, absent change, the actuarial soundness of the system would decrease over a 10-year period. At the same time, the board adopted a policy which would reset the 30-year amortization period each year for three years, which could be viewed as ensuring at the time that the unfunded liabilities of the fund would increase each of those years and, potentially, in perpetuity. This perpetual underfunding could support an inference that the decisions made by the board were not taken in the exclusive interest of its members. Other than the potential ability to withstand job losses in a single year, StanCERA and County point to no facts in the record before us demonstrating this potential perpetual funding shortfall would benefit StanCERA's members. Considered in the light most favorable to appellants, an issue of fact arises as to whether the board's balancing of a single year of improved job prospects against a perpetual funding shortfall that could leave the pension system unable to pay benefits violates StanCERA's duty of loyalty. With respect to both theories, evidence showing the resulting increase in unfunded liabilities and subsequent decrease in actuarial funding percentages could demonstrate potential damages accrued due to these changes. While the trier of fact could rely on evidence of job retention to find no breach occurred, such factual balancing is not proper at the summary judgment stage.

For the reasons set forth above, we conclude the trial court erred in granting summary judgment to StanCERA and County. Although many facts detailing the disputed conduct are not in dispute, there remain material issues of fact whether the resulting conduct violated the constitutionally mandated fiduciary duty of loyalty the board owed to StanCERA's members. Having reached this conclusion, we now briefly consider certain evidentiary rulings made during discovery and briefing on the summary judgment motions.

41.

V.    EXCLUSION OF SHEFFLER'S EXPERT OPINIONS.*

In connection with appellants' motion for summary judgment and opposition to StanCERA's similar motion, appellants submitted two declarations from William Sheffler.

In the declaration submitted with appellants' motion, Sheffler provided a brief summary of his background as an actuary and former trustee of the San Diego City Employees Retirement System, including training he received regarding the duties and responsibilities of a trustee of a public pension system in California.  One of these training sessions covered duties owed under section 17, subdivisions (a) and (c).  Sheffler then noted the documents he had reviewed in the case, which were identified as StanCERA's actuarial valuations, an actuarial experience study, and "various memoranda and other relevant actuarial studies and reports."  Following this brief historical and case-specific background, Sheffler provided five opinions, each of which are fairly exemplified by the following opening opinion:  "StanCERA's use of $21.4 million of trust fund assets to offset the County's employer contribution from the County for fiscal year July 1, 2010, to June 30, 2011, was imprudent, in violation of . . . section 17, subdivision (c) . . . .  This is an actuarial unsound practice that permits a pension plan to become underfunded, and is very difficult to correct."  No further analysis or support was provided for any of Sheffler's opinions.

In the declaration submitted with appellants' opposition, Sheffler repeated his background, training, and document review sections.  He then provided four paragraphs of purported opinions.  The first stated that funds set aside to pay "benefits other than service pension, disability, or survivor benefits" are considered according to "Generally Accepted Actuarial Principles" to be non-valuation funds.  The second contended the actuarial certifications submitted with each of StanCERA's actuarial reports "have

_____

*       See footnote, *ante*, page 1.

42.

nothing to do with whether the actuarial practices meet the requirements of the California Constitution or meet StanCERA's fiduciary duty." The third stated that "not all 30-year amortization schedules include negative amortization" and claimed StanCERA's wage growth assumption caused the negative amortization in this case. The fourth attempted to define the damages accrued in this case by adding together three of the disputed transfer amounts and arguing the pension fund lost these amounts and the investment earnings which could have been earned on those amounts. It claimed this harm was extended due to the negative amortization schedule utilized.

StanCERA moved to strike the nine opinions offered by Sheffler, and the trial court granted StanCERA's motions. With respect to Sheffler's first set of opinions, the trial court excluded each of the five opinions on the same three grounds: (1) the testimony constituted improper legal conclusions, ultimate facts, and argumentative statements; (2) the testimony was not supported by a detailed or extensive reasoned explanation; and (3) the testimony was improperly resolving a question of law. With respect to the opinions offered in opposition, the trial court concluded all four were excludable on three similar grounds: (1) lack of foundation; (2) lacking a reasonable basis for the opinion; and (3) relevance. Appellants contend these exclusions were erroneous.

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.) "A witness testifying in the form of an opinion may state . . . the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a

43.

witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." (Evid. Code, § 802.) "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*).)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citation.] The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. [Citation.] In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (*Sargon*, *supra*, 55 Cal.4th at p. 772.)

Considering the first set of opinions offered by Sheffler, we find no abuse of discretion in their exclusion. The expert qualifications recited and the documents reviewed and identified have little to no bearing on the bare-bones opinions offered. Although Sheffler is undoubtedly qualified as an expert actuary and has worked as a trustee for other county retirement funds, these base qualifications shed no light on the basis or reasoning supporting Sheffler's opinion that the actions taken by StanCERA

44.

were imprudent. Sheffler identifies no knowledge of specific actuarial practices, no first-hand knowledge of or experience in similar situations, nor any training related to the transfer of non-valuation funds or adoption of an amortization rate which includes negative amortization upon which a court could conclude his opinions are valid or reliable. In addition, appellants have failed to identify any documents in the record and reviewed by Sheffler upon which he could conclude StanCERA acted imprudently. For these reasons, the trial court correctly excluded the proffered expert opinion that StanCERA's conduct was imprudent.

With respect to the second set of opinions, it is notable that each refers to some additional fact, however slight, upon which Sheffler's opinion is based. Such grounding for these opinions is generally required to overcome the admissibility burden at summary judgment. (See *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187 [finding declaration expert conducted extensive examinations using specific testing methods sufficient to support a summary judgment opposition].) Moreover, the second set of opinions are directed to factual matters within Sheffler's expertise and experience. However, we need not resolve whether these opinions were admissible, as summary judgment was improper even without considering the opinions offered. We leave it to the trial court to determine whether any further opinions offered will be admissible at trial.

VI.     CONSIDERATION OF PUBLIC HEARING EVIDENCE AND DENIAL OF MOTION TO COMPEL.[*]

Appellants object to the consideration of evidence, and the resulting request for a favorable inference supporting StanCERA's and County's positions, derived from the public meetings StanCERA conducted while deliberating and voting on the contested changes. Although questioning the basis for the trial court's ruling in their reply brief, appellants do not directly contest the conclusion that board members' discussions are

---

[*]     See footnote, *ante*, page 1.

45.

subject to a deliberative process privilege. We therefore take no position on that point. Rather, appellants contend the trial court's ruling that privilege concerns barred discovery into non-public advice means publicly available records cannot be consulted to determine the basis for the board's conduct. Appellants further assert that no inferences can be drawn in StanCERA's and County's favor on summary judgment in light of this evidentiary ruling.

With respect to the first issue, there is no selective waiver of privilege here. The evidence available from public portions of StanCERA meetings is not privileged in the first instance and thus, is not introduced as a result of selective waiver. With respect to the second issue, we find the complaint moot in light of the conclusion summary judgment was improperly granted. Taking the evidence, as considered, in the light most favorable to appellants and drawing all reasonable inferences in appellants' favor, we have reversed the grant of summary judgment.

Relatedly, appellants contend the trial court erroneously denied their motion to compel further deposition testimony from StanCERA's expert actuary on the ground the motion was untimely. StanCERA has not opposed this ground for relief. Given the case is being remanded and the trial court's ruling rested on an undefined belief that "[u]nder the circumstances of this case, the motion is untimely," we reverse the order and remand for further proceedings to determine whether an additional deposition is appropriate.

# DISPOSITION

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion.  Parties shall bear their own costs on appeal.

_____

DETJEN, J.

WE CONCUR:

_____

GOMES, Acting P.J.

_____

POOCHIGIAN, J.